**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Southern Division)**

| | |
|---|---|
| VERIZON MARYLAND INC.,<br><br>1 East Pratt Street<br>Baltimore, MD 21202<br>Baltimore City<br><br>       Plaintiff,<br><br>  vs.<br><br>MONTGOMERY COUNTY, MARYLAND,<br><br>Executive Office Building<br>101 Monroe Street<br>Rockville, MD 20850<br>Montgomery County<br><br>      Defendant. | Civil No.:_____ |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1.     Plaintiff Verizon Maryland Inc. ("Verizon") brings this action to challenge

Defendant Montgomery County's (the "County") unlawful scheme governing applications to

provide cable television service.  The County's cable ordinance and regulations, on their face,

violate the First Amendment to the United States Constitution, the federal Communications Act,

and Maryland law.  The County's application of its cable laws to Verizon's request for a cable

franchise likewise is illegal under federal and state law.  Verizon seeks relief to protect its

constitutional right to free expression and to enjoin the further application of the County's invalid and preempted cable requirements.

2.     As part of a national initiative begun in 2004, Verizon has launched a campaign to upgrade its communications facilities in Maryland by extending fiber-optic cables to customers' premises ("Fiber-to-the-Premises" or "FTTP").  This effort will permit the delivery of both higher-speed Internet services and cable television programming over the same physical network used to provide telephone service to local consumers.  Verizon's upgraded network is known as "FiOS."

3.     Verizon's cable television offering—known as "FiOS TV"—is a sorely needed new alternative to the traditional cable television services offered in the County, which suffer from steeply rising prices and poor service due to the lack of competition.  Verizon's FiOS TV offering promises lower prices, a far richer array of programming choices, and better service than is offered by incumbent cable operators.  In those localities where a Verizon affiliate has been permitted to provide cable service, customers have flocked to the FiOS service, and incumbent cable operators have been forced to slash prices by 28-42 percent.  Consumers in Montgomery County stand to reap similar benefits from Verizon's entry into the local cable market.

4.     Although state and federal law authorize Verizon to construct and upgrade its fiber-optic telecommunications network in Montgomery County, a local cable ordinance requires Verizon to obtain a cable franchise from the County—an authorization identical to a permit or license—before making FiOS TV available to local consumers.  In May 2005, Verizon approached Montgomery County and asked local officials to grant it such a franchise.  Over one year later, the County still has failed to approve Verizon's request to provide cable service.  Instead of welcoming Verizon's desire to provide FiOS TV as a boon to local consumers,

Montgomery County has used its power to withhold a necessary franchise to force Verizon to accede to the County's demands for payments, in-kind contributions, and burdensome local regulatory authority—all of which are illegal under federal law.  County officials have made clear that unless Verizon agrees to the County's unlawful terms—and then waives its right to challenge the illegality of many of them—the County will indefinitely delay further consideration of Verizon's request for a franchise.  The County's position is made possible by a county cable ordinance that vests local officials with boundless authority over whether and on what terms to award cable franchises.

5.     Montgomery County's recalcitrance in preventing Verizon from competing with the incumbent cable operator stands in sharp contrast to the actions of other local governments.  To date, Verizon affiliates have obtained cable franchises to offer FiOS TV service in roughly 100 jurisdictions throughout the country.  In the Washington, D.C. metropolitan area, Verizon affiliates have obtained or are obtaining a franchise everywhere they have sought one, with the sole exception of Montgomery County.  In Maryland, Howard County, Bowie, and Laurel have all granted Verizon a franchise; Anne Arundel County is expected to grant a franchise in the next few weeks.  Negotiations with Prince George's County are proceeding well.  In northern Virginia, a Verizon affiliate has obtained franchises from Arlington County, Loudoun County, Fairfax County, Herndon, the City of Fairfax, Falls Church, the Marine Corps Base at Quantico, and Prince William County.  The company expects to receive a franchise from the remaining community, Leesburg, in the next few weeks.

6.     Montgomery County's cable franchise system is illegal in many respects.  First, the County's cable ordinance, on its face, violates the First Amendment.  By adding cable television to its menu of communications services, Verizon seeks to engage in a form of speech

protected by the First Amendment. *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 636 (1994); *City of Los Angeles v. Preferred Commc'ns, Inc.*, 476 U.S. 488, 494 (1986). Montgomery County's cable ordinance operates as a prior restraint on this speech because it obligates entities like Verizon to obtain government approval before engaging in protected expression. The ordinance violates the First Amendment because it delegates to local authorities unbridled discretion to approve or withhold franchises at will, to charge any application-related fees they wish, to condition franchises on any demands they see fit, and to render franchise decisions on any timeline they choose.

7.      Second, the County's cable ordinance, together with its binding regulations, on their face subject Verizon's telecommunications facilities and its telecommunications and Internet access services—not just its *cable* services—to the jurisdiction of County authorities, including the obligation to pay to the County a fee of 5% of the revenues derived from such services. These obligations directly violate federal and state laws.

8.      Third, in applying its cable ordinance to Verizon, the County has violated federal law. The County has unreasonably delayed Verizon's ability to engage in protected speech and has unlawfully required Verizon to agree to provide a host of services and fees, and to submit to a thicket of regulations, as a condition of granting it a franchise.

9.      Fourth, the County's actions violate the federal antitrust laws. The County has entered into an agreement with the incumbent cable monopolist, Comcast, that ensures that the County will impose on any new cable entrant the same onerous terms and conditions to which Comcast has agreed. Because the costs of such terms are an unreasonable barrier to entry for a new competitor that has not yet signed up a single customer, the County's agreement with Comcast is an unlawful agreement in restraint of trade.

10.     Although this action does not challenge the County's authority to require Verizon to obtain a franchise before providing cable service, Verizon seeks relief from the County's laws and actions implementing that franchise requirement.  In particular, to protect its rights under the First Amendment, federal statute, and Maryland law, Verizon seeks a declaration that the County's cable laws are illegal on their face and an order directing the parties to engage in good-faith negotiations over the terms of a franchise agreement, with the objective of reaching agreement within sixty days, or to return to the Court for further relief in the event no agreement is reached.

**JURISDICTION AND VENUE**

11.     This Court has jurisdiction over the parties and subject matter at issue in this complaint.

12.     Verizon's federal claims arise under the Constitution and laws of the United States, including the Supremacy Clause, the First Amendment, the Fourteenth Amendment, the federal Communications Act (47 U.S.C. §§ 151 *et seq.*), the federal Sherman Act (15 U.S.C. §§ 1 *et seq.*), and 42 U.S.C. § 1983.  Jurisdiction is proper under 28 U.S.C. § 1331, 28 U.S.C. § 1337, 28 U.S.C. § 1343, and 47 U.S.C. § 555.  This Court may enter declaratory relief under 28 U.S.C. §§ 2201-02.  This Court has supplemental jurisdiction over Verizon's state law claims pursuant to 28 U.S.C. § 1367(a).

13.     Venue in this district is proper under 28 U.S.C. § 1391(b) because the defendant resides here and because a substantial part of the events giving rise to Verizon's claims arose in this judicial district.  Venue in this district is also proper under 47 U.S.C. § 555(a)(1).

## PARTIES

14.     Verizon is a local telephone company that offers voice and data services to consumers in Montgomery County and the state of Maryland pursuant to a franchise granted by the State of Maryland in 1884.  That franchise, which is codified in Maryland statute and is perpetual in term, confers on Verizon the right to construct telecommunications facilities in the public rights-of-way within the state's borders.  By exercising its rights under this franchise, Verizon has obtained easement rights that, among other things, entitle it to access its facilities for necessary repairs.  Verizon currently provides service to over 250,000 households in Montgomery County.  Verizon has its principal place of business at 1 East Pratt Street, Baltimore, Maryland 21202.  Verizon is an indirect, wholly-owned subsidiary of Verizon Communications Inc.

15.     Montgomery County, Maryland is a Charter County within the State of Maryland, having elected home rule pursuant to Article XI-A of the Constitution of Maryland and having adopted a Home Rule Charter, pursuant to which legislative power is vested in the County Council and executive authority is vested in the County Executive.  The County Council and the County Executive are officially located in Rockville, Maryland, the County seat.

## BACKGROUND

## I.     VERIZON WILL INTRODUCE MUCH-NEEDED CABLE COMPETITION TO MONTGOMERY COUNTY.

16.     Verizon's FiOS TV offering will introduce much-needed competition for video services and create significant benefits for cable consumers in the County.  In the communities where a Verizon affiliate has succeeded in obtaining a competitive cable franchise, consumers

have seen lower rates, improved service, and expanded programming diversity.  The introduction

of Verizon's FiOS TV in Montgomery County promises the same results for local consumers.

      **A.**      <u>**Video Competition Is Currently Lacking in the County.**</u>

      17.      Comcast is the dominant supplier of video service in Montgomery County.

Approximately 65% of the approximately 347,000 households in the County purchase video

services from Comcast.  Among cable subscribers, approximately 95% subscribe to Comcast.

Because of its dominant position and the lack of meaningful competition, Comcast has been able

to raise prices over 25 percent since 2000, nearly three times the annual rate of inflation.  From

2004 to 2005, Comcast raised prices by 6 percent.

      18.      Only meaningful wireline competition—that is, competition from an operator that

provides video programming over a physical network of wires and cables—can constrain

Comcast's ability to charge these supracompetitive prices.  The Federal Communications

Commission ("FCC"), in its most recent competition report released in March 2006, found that

in the places where incumbent cable companies face competition from a wireline competitor,

monthly cable rates are 15% lower.  *Annual Assessment of the Status of Competition in the*

*Market for the Delivery of Video Programming*, Twelfth Annual Report, MB Docket No. 05-

255, FCC 06-11, ¶ 41 (FCC rel. Mar. 3, 2006) ("*FCC Video Competition Report*").  The General

Accounting Office similarly found that wireline competitors "induce incumbent cable operators

to respond by providing more and better services and by reducing rates and offering special

deals."  U.S. General Accounting Office, Report to the Subcommittee on Antitrust, Competition

Policy, and Consumer Rights, Committee on the Judiciary, U.S. Senate: Telecommunications,

*Wire-Based Competition Benefited Consumers in Selected Markets* at 12 (Feb. 2004).  The

availability of satellite television (also known as "Direct Broadcast Satellite"), by contrast, has lowered cable rates only slightly. *FCC Video Competition Report* ¶ 5.

19.     In Montgomery County, the only wireline competitor for video service is RCN (formerly known as StarPower), which obtained a cable franchise from the County in 1999. Since that time, RCN has declared bankruptcy and has significantly scaled back its build-out plans in the County.  RCN's network reaches only 75,000 households in the Silver Spring area (the southern part of the County) and serves only about 15,000 customers.  Most video customers in the County who do not subscribe to Comcast purchase service from satellite television providers.

20.     The lack of wireline competition imposes enormous costs on consumers. Nationally, the delays in wireline competition for video service caused by the local cable franchise process are resulting in economic losses estimated at between $8.2 billion and $21.4 billion per year.

### B.     Verizon's New FiOS Network Offers Significant Advantages Over Other Alternatives in the County.

21.     Verizon and its affiliates are the first telecommunications carriers in the country to extend the next generation of telecommunications facilities—fiber-optic facilities—all the way to customers' homes and businesses on a national scale.  At a cost of several billion dollars, Verizon and its affiliates are upgrading their existing telecommunications facilities to create FiOS fiber-optic networks in Maryland and 15 other states.  By the end of 2005, the FiOS network had reached three million homes nationwide.  That number is expected to grow to six million homes by the end of 2006.  In Montgomery County, FiOS now reaches approximately 142,000 households.

22.     Verizon's FiOS network has superior capabilities that translate into wider programming choices and faster Internet speeds for consumers.  In Montgomery County, Verizon's FiOS network will provide much greater capacity for transmitting video, music, and data than Comcast's traditional cable system.

23.     Because of its technological advantage, Verizon will be able to offer local consumers more digital channels, more high-definition channels, and more features.  Verizon customers will be able to choose from nearly 400 digital video and music channels and over 20 high-definition channels.  By contrast, Comcast currently offers its Montgomery County customers only up to 240 digital video and music channels and 14 high-definition channels.

24.     Verizon's FiOS TV will provide customers in the County many channels that Comcast does not currently offer, including: ESPNU (sports); CNN International, CNBC World, Bloomberg TV, and ABC News Now (news); Science Channel, Pentagon Channel, and Military History Channel (information); Lifetime Real Women and Oxygen (women); Shop at Home, America's Store, EXPO, Jewelry and Shop NBC (shopping); Wisdom, Fit TV, and Wealth TV (home and leisure); Crime & Investigation Network, Sleuth, Ovation, Fox Reality, and Fuel (pop culture); Gospel Music Channel, VH1 Country, BET Gospel, Great American Country, and Soundtrack Channel (music); Family Net and AmericanLife TV (family); Boomerang (children); Galavisión, Mun2, and Si TV (people and culture); and Church, I-Life, and JCTV (religion).  In addition, Verizon will give customers in Montgomery County the opportunity to watch Washington Nationals baseball games on the Mid-Atlantic Sports Network—a channel that Comcast also does not offer.

25.     Verizon will also offer customers diverse programming packages tailored to customers' particular entertainment interests.  Whereas incumbent cable operators typically

structure their premium packages based on the number of channels the customer purchases, Verizon also offers premium packages of themed programming (e.g., a Movie Package, a Sports Package, and a Spanish Language Package). Verizon's Spanish-language package (called La Conexión) includes more than 20 popular Spanish-language channels, in addition to popular English and digital music channels.

26.    Because of its superior technological capacities, Verizon also can offer faster Internet service in the County. Internet traffic on Verizon's network will travel at speeds of up to 30 megabits per second ("Mbps")—more than five times faster than the fastest broadband service that Comcast currently offers in the County. High-speed Internet access services offered by satellite television providers are considerably slower: they offer a maximum speed of only 1 Mbps downstream and only 56k upstream.

27.    Verizon's prices are lower than those of the County's current operators. Verizon's standard FiOS TV package (called Expanded Basic) will offer local channels such as ABC, CBS, NBC, and Fox, nearly 180 digital cable and movie channels, 47 all-digital music channels, and more than 20 high-definition channels for $39.95 per month. Verizon will offer Internet access service with 15 Mbps downstream bandwidth for an additional $45 per month— an average price of $3 per megabit. Comcast's most comparable video offering in Montgomery County (called Digital Plus) costs $68.60 per month, and its most comparable high-speed Internet service offers only 6 Mbps for $52.95 per month—an average of nearly $9 per megabit. Comcast charges even more, $67.95 per month, for high-speed Internet service for customers who do not subscribe to Comcast's cable service. Verizon's offering will also surpass that of RCN, which only serves a small number of homes in the County.

28.     Verizon's entry into the Montgomery County cable market will bring the benefits of competition to local consumers, even for those who do not choose to subscribe to FiOS TV. In communities where a Verizon affiliate has been permitted to offer FiOS TV, consumers have seen lower prices and improved service from their incumbent operators.

29.     For example, in Keller, Texas, where a Verizon affiliate first launched FiOS TV service, the incumbent cable provider, Charter, reduced its price by $16 per month, or over 28 percent compared to surrounding areas where FiOS TV is not offered.  To date, nearly one quarter of homes in Keller to which FiOS TV is available have signed up for the service.  In Herndon, Virginia, after a Verizon affiliate won a franchise and began competing there, incumbent Cox dropped its video price from $52.44 per month to $30.00 per month.  After a Verizon affiliate began competing in Temple Terrace, Florida, incumbent Bright House dropped its video price from $58.45 per month to $36.33 per month.

## II.     STATUTORY AND REGULATORY LIMITS ON LOCALITIES' AUTHORITY OVER CABLE AND COMMUNICATIONS SERVICES

30.     Federal and Maryland law both protect Verizon's effort to enter the video market. Federal law expressly precludes localities from erecting barriers to entry, and both federal and state law bar local authorities from asserting regulatory jurisdiction over telecommunications and Internet services provided by companies like Verizon.

31.     The Communications Act of 1934, as amended, comprehensively regulates the communications industry in the United States.  47 U.S.C. §§ 151 *et seq*.  The Act, which covers various types of voice, data, and video services, "recognizes that some facilities can be used to provide more than one type of service" and "that multi-purpose facilities will receive different

regulatory classification and treatment" depending on the particular service they provide.

*MediaOne Group, Inc. v. County of Henrico*, 257 F.3d 356, 364 (4th Cir. 2001).

32.     Verizon's multi-purpose FiOS network is capable of providing services that are governed by three separate sections of the Communications Act:  Title I, Title II, and Title VI. Traditional voice services—known as "Plain Old Telephone Service"—are regulated as "telecommunications services" under Title II of the Communications Act.  Verizon also offers high-speed Internet access through its FiOS network.  The FCC has classified such wireline broadband Internet access services as "information services" that are governed by Title I of the Communications Act.  Finally, Verizon seeks to provide cable television service using the same facilities that it uses to provide telecommunications and information services.  Cable service is regulated by Title VI of the Communications Act.

### A.     Federal Regulation of Cable Service

33.     From the birth of cable television in the late 1940s to the early 1980s, local governments exercised essentially plenary control over cable television.  Cable operators required permission (a "franchise") from local governments to string their wires through the public rights-of-way.  Historically, local governments generally granted an exclusive franchise to a single cable company and resisted the entry of new cable providers.  In particular, local governments required cable operators to pay large fees for the privilege of obtaining a franchise; demanded that cable operators provide large subsidies for public, educational, and governmental ("PEG") programming; and otherwise stymied competition in the provision of cable services.

34.     Beginning in 1984, Congress took action to correct municipal abuses and anti-competitive action in the cable area.  When Congress's initial efforts did not fully succeed in reining in municipal overreaching and in opening markets to competition, it again intervened in

1992 and 1996.  These three legislative efforts, taken together, comprehensively restrain

localities from imposing burdensome conditions on new cable entrants and establish a firm

national policy in favor of competition.

### 1. *The 1984 Cable Act: Removing Barriers to Entry*

35.      In 1984, Congress began its effort to establish a national cable policy by passing

the Cable Communications Policy Act of 1984 as a new Title VI to the federal Communications

Act (as amended, the "Cable Act").  47 U.S.C. §§ 521 *et seq*.  The Cable Act was intended to

"defin[e] and limit[] the authority that a franchising authority may exercise through the franchise

process."  H.R. Rep. No. 98-934, at 19 (1984), *as reprinted in* 1984 U.S.C.C.A.N. 4655, 4656.

In enacting the Cable Act, Congress expressed its intent to "promote competition in cable

communications and minimize unnecessary regulation that would impose an undue economic

burden on cable systems."  47 U.S.C. § 521(6).  Accordingly, the Cable Act recognized the

continuing authority of state and local governments to issue cable franchises consistent with state

and local law, *see, e.g.*, *id.* §§ 522(10), 541, but sharply limited localities' power to impose

barriers to new cable entrants.

36.      As one such measure to constrain local authority over cable franchising, Congress

capped the maximum permissible "franchise fee[]" that a franchising authority may demand as a

condition of granting a franchise.  *Id.* § 542(b).  The Act provides that a locality may charge a

cable operator no more than 5% of its gross revenues derived from the provision of cable

services.  *Id.*  The 5% cap applies broadly to "any tax, fee, or assessment of any kind imposed by

a franchising authority or other governmental entity on a cable operator . . . solely because of

[its] status as such."  *Id.* § 542(g)(1).  The cap thus restricts the ability of franchising authorities

to demand both monetary payments and in-kind contributions that exceed 5% of the operator's gross cable revenues.

37.    For franchises issued after October 1984, the Cable Act specifies four narrow exceptions to the 5% cap:  (a) generally applicable taxes (such as sales or income taxes); (b) "capital costs . . . incurred by the cable operator" for PEG access facilities (such as the capital costs a cable operator agrees to incur to construct a public access studio); (c) "requirements or charges incidental to the awarding or enforcing of the franchise, including payments for bonds, security funds, letters of credit, insurance, indemnification, penalties, or liquidated damages"; and (d) copyright fees.  *Id*. § 542(g)(2)(A), (C), (D), (E).  Any fees or assessments that do not fit within one of these exceptions—such as PEG expenditures other than capital costs, requirements that a cable operator furnish in-kind benefits such as free video services or equipment, and substantial franchise application or acceptance fees—count against the 5% cap.

38.    In addition to the 5% cap, the Cable Act establishes separate limits on the PEG contributions that a locality may require a cable operator to provide.  Under the Act, local governments may require cable operators to designate channels for PEG programming, but may not demand that they provide other forms of PEG contributions such as cash or in-kind support. Thus, "a franchising authority may establish requirements . . . with respect to the designation or use of channel capacity for [PEG] use," *id*. § 531(a), but may not demand that cable operators provide any PEG services, facilities, equipment, or funding unless they are "proposed by the cable operator," *id*. § 531(c).  Prospective franchisees may volunteer to support PEG beyond the provision of channel capacity and, to the extent that they do, may be held to such commitments, *id*., but localities cannot impose such requirements on unwilling franchise applicants.

39.     The Cable Act also limits the contributions for "institutional networks" that a local franchising authority may demand.  Institutional networks (also known as "I-Nets") are specially dedicated communication networks that serve customers who are not residential subscribers.  *See id.* § 531(f).  The extent of localities' authority to impose I-Net demands is delineated in section 531, which provides that a locality may require that "channel capacity on institutional networks be designated for educational or governmental use."  *Id.* § 531(b).  Thus, localities may not require cable operators to construct an I-Net or demand payment for constructing or operating an I-Net.  As the Fifth Circuit stated, "localities may require that cable operators devote space on their existing institutional networks, if there are any such networks, to educational or governmental use, but the statute does not authorize local governments to *require* the construction of institutional networks."  *City of Dallas v. FCC*, 165 F.3d 341, 350 (5th Cir. 1999).

40.     The Cable Act also bars localities from imposing any requirements on cable operators that do not relate to the provision of cable services.  47 U.S.C. § 544(a), (b).  The Act provides that a franchising authority has no power to regulate services, facilities, and equipment provided by a cable operator "except to the extent consistent with this subchapter."  *Id.* § 544(a).  The Act goes on to provide that localities may establish requirements for facilities and equipment only "to the extent related to the establishment or operation of a cable system."  *Id.* § 544(b).  A locality therefore may not impose requirements on cable operators that do not relate to the cable system.

41.     The Cable Act also makes clear that localities' role in the cable franchising process does not empower them to regulate telecommunications networks.  The Act provides that a "cable system" that may be subject to local regulatory jurisdiction includes a

telecommunications provider's facility only "to the extent that such facility is used in the transmission of video programming directly to subscribers."  *Id.* § 522(7).  Thus, a locality's authority to issue cable franchises does not give it regulatory authority over the entirety of an integrated mixed-use network, even when that network is used, in part, to deliver cable service.

2.     ***The 1992 Amendments to the Cable Act: Prohibition on Monopolies and Unreasonable Refusals to Award Competitive Franchises***

42.     After the Cable Act was enacted in 1984, Congress found that competition was not developing as it intended and that many consumers were facing ever-increasing costs for cable television.  "For a variety of reasons, including local franchising requirements," most cable television subscribers had "no opportunity to select between competing cable systems," because the distributors did not face sufficient "local competition."  Cable Television Consumer Protection and Competition Act of 1992, Pub. L. No. 102-385, § 2(a)(2), 106 Stat. 1460.  The result was "undue market power for the cable operator as compared to that of consumers and video programmers."  *Id.*; *see also* S. Rep. No. 102-92, at 8-9 (1991), *as reprinted in* 1992 U.S.C.C.A.N. 1133, 1141 (noting that "[a] cable system serving a local community, with rare exceptions, enjoys a monopoly" and that "the cable industry itself recognizes that it holds monopoly power").

43.     In the Cable Television Consumer Protection and Competition Act of 1992, Congress sought to remedy these problems by eliminating the ability of state and local governments to award exclusive cable franchises or to unreasonably refuse to award additional competitive franchises.  Congress declared:  "A franchising authority may award, in accordance with the provisions of this subchapter, 1 or more franchises within its jurisdiction; except that a franchising authority may not grant an exclusive franchise and may not unreasonably refuse to

award an additional competitive franchise." 47 U.S.C. § 541(a)(1). The prohibition against "unreasonabl[e] refus[als] to award" competitive franchises requires localities to grant franchise requests in a timely fashion.

### 3. The Telecommunications Act of 1996: Encouraging Telecom Providers to Enter the Cable Market

44. Congress acted again to promote cable competition in the Telecommunications Act of 1996 ("1996 Act"). As originally enacted in 1984, the Cable Act prohibited telephone companies like Verizon from providing cable service within the same territory they were assigned for providing telecommunications services. *See* 47 U.S.C. § 533(b), *repealed by* Telecommunications Act of 1996, Pub. L. 104-104, 110 Stat. 56. Every court to consider the constitutionality of this ban, however, invalidated the prohibition as violating telephone companies' First Amendment rights. *See, e.g.*, *US West, Inc. v. United States*, 48 F.3d 1092 (9th Cir. 1994), *cert. granted and judgment vacated and remanded by* 516 U.S. 1155 (1996), *dismissed as moot in light of the 1996 Act sub nom. Pac. Telesis Group v. United States*, 84 F.3d 1153 (1996). Accordingly, the 1996 Act authorizes telephone companies to offer video services in their telephone service areas. *See* 47 U.S.C. § 571.

45. The 1996 Act took further steps to encourage telephone companies to provide cable service by limiting the power of local franchising authorities to exert burdensome regulatory control over telecommunications services. First, the Act states that the cable franchising authority granted in Title VI does not extend to the cable provider's provision of telecommunications services. *Id.* § 541(b)(3)(A)(ii). This means that localities may not leverage their cable franchising authority to interfere with telecommunications services. Second, the Act prohibits a locality from imposing any requirement as part of the cable franchising process that

"has the purpose or effect of prohibiting, limiting, restricting, or conditioning the provision of telecommunications services by a cable operator." *Id*. § 541(b)(3)(B).  Third, the Act prohibits localities from requiring a cable provider "to discontinue the provision of a telecommunications service" under any circumstances. *Id*. § 541(b)(3)(C)(i).  Fourth, a locality may not *require* a cable provider to provide any telecommunications service or facilities as a condition of obtaining a franchise. *Id*. § 541(b)(3)(D).

46.    The 1996 Act further makes clear that local authorities may not levy franchise fees on revenues generated from non-cable services.  The 5% franchise fee permitted under the Cable Act may be levied only on "gross revenues derived . . . from the operation of the cable system *to provide cable services*." *Id*. § 542(b) (emphasis added).  Localities may not use their franchising authority to impose fees upon telecommunications and information services.

B.    **Federal Regulation of Telecommunications Services**

47.    Unlike the regulatory regime for cable services, which allows localities to play a franchising role subject to express federal limitations, telecommunications services are governed exclusively at the federal and state levels.  Under Title II of the Communications Act, the FCC has exclusive jurisdiction to regulate interstate and international telecommunications service, and states generally have jurisdiction to regulate intrastate telecommunications service.

48.    Under Title II, telecommunications providers are regulated as common carriers. This means that they must, for example, charge reasonable and nondiscriminatory rates for telecommunications services, design their systems so that other carriers can interconnect with their telecommunications networks, and make contributions to a "universal service" fund.

49.    Title II explicitly prohibits state and local governments from imposing excessive burdens on telecommunications providers.  The statute provides that "[n]o State or local statute

- 18 -

or regulation, or other State or local legal requirement, may prohibit *or have the effect of prohibiting* the ability of any entity to provide any interstate or intrastate telecommunications service." *Id.* § 253(a) (emphasis added).

### C. Federal Regulation of Internet Access Service

50.     Broadband Internet access service provided by wireline carriers is governed by a third regulatory scheme—one that exempts these services from the regulation of both Title VI (which governs cable service) and Title II (which governs telecommunications service).  In accordance with a federal policy "to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation," *id.* § 230(b)(2), the FCC ruled that wireline broadband Internet access service should be classified as a Title I "information service"—not a "telecommunications service" that would be subject to the burdensome and reticulated regulations set forth in Title II of the Communications Act.  Report and Order and Notice of Proposed Rulemaking, *In the Matter of Appropriate Framework for Broadband Access to the Internet Over Wireline Facilities*, CC Docket Nos. 02-33 et al., FCC 05-150, ¶¶ 3, 14, 80 (FCC rel. Sept. 23, 2005).

51.     Wireline broadband Internet access services likewise are not subject to regulation by local franchising authorities.  The Cable Act expressly denies local authorities the power to use the franchising process to "establish requirements for . . . information services."  47 U.S.C. § 544(b)(1).

### D. Maryland Regulation of Telephone Companies

52.     Maryland law grants the state's Public Service Commission ("PSC") exclusive jurisdiction to regulate intrastate telecommunications services provided by telephone companies, as well as the facilities they use to provide such services.  *See* Md. Code, Public Utility Cos.,

§§ 2-112 & 113 (giving supervisory and regulatory power over public service companies, including telephone companies, to the PSC). Local governments, such as the County, are preempted by Maryland law from regulating matters that are within the exclusive jurisdiction of the PSC, except for a limited police power authority to prescribe reasonable regulations for the use of public rights-of-way.

53. Maryland law also specifically grants Verizon the right to construct its facilities in the public rights-of-way throughout the state. Under the terms of an 1884 franchise, which Maryland has codified in statute, Verizon may build its telecommunications infrastructure along, on, above, and under all roads, streets, and highways and across bridges and waters within the borders of the state. *See* Md. Code, Public Utility Cos., §§ 8-101 through 8-107. Maryland granted this franchise to induce Verizon to construct and extend telephone lines to residents, businesses, and governmental entities throughout the state. When Verizon placed its telecommunications infrastructure within the state, it obtained, by operation of law, easement rights that entitle it to, among other things, access its infrastructure to perform necessary repairs.

## III.   MONTGOMERY COUNTY'S CABLE LAWS

54. The Montgomery County Cable Ordinance (the "Ordinance") pervasively regulates cable operators in the County. Montgomery County Code Chapter 8A, Cable Communications, §§ 8A-1 *et seq*. (attached as Exhibit 1). At the outset, the Ordinance declares that no person may "construct or operate a cable system in the County without a franchise granted by the County." *Id*. § 8A-4. Hence, a cable provider may not provide cable service— that is, may not engage in constitutionally protected speech—without first obtaining permission from the County.

- 20 -

55.     To obtain such permission, the Ordinance requires applicants to submit detailed franchise applications for the County's review.  *Id*. § 8A-8.  Under the Ordinance, County officials review franchise applications in two stages.  First, the County Executive (the "Executive") must propose to grant or deny the application.  *Id*. § 8A-9(g).  If the Executive proposes to grant the franchise, the Executive and the applicant must proceed to negotiate and to agree on the terms of a franchise agreement.  *Id*. § 8A-9(h).  If the Executive and the applicant agree on a proposed franchise agreement, the Executive must submit the proposed agreement to the County Council (the "Council") for approval.  *Id*. § 8A-9(j).  At the second stage of the process, the County Council has the choice to grant the franchise, to grant it with conditions, to remand it to the Executive for further consideration, or to deny it altogether.  *Id*. § 8A-9(k)(1)(A)-(D).

56.     The Ordinance contemplates that the County will negotiate a franchise agreement that will apply to cable service provided in unincorporated areas of the County as well as in the "[p]articipating municipalit[ies]," i.e., cities that agree to permit the County to administer the cable franchise on their behalf.  *See id*. § 8A-3 (defining "[p]articipating municipality").

57.     At each stage of the franchise application and review process, the Ordinance bestows on County officials unrestrained discretion with respect to whether and on what terms a cable provider will be permitted to provide cable service.  At the application-filing phase, the Ordinance specifies extensive information that an applicant must provide, including the applicant's background, its sources of financing, the geographic area to be served, the facilities proposed and their construction, the services to be provided and their rate structure, and pro forma financial projections.  *Id*. § 8A-8(d)(1)-(13); *see also id*. § 8A-8(a) – (c) (setting out other application requirements).  In addition, the Ordinance allows County officials to demand, among

- 21 -

other things, that operators provide "[a]ny other information necessary to demonstrate compliance with this Chapter, and any other information that the County requests from the applicant." *Id.* § 8A-8(d)(15). For "overbuild" franchises (franchises built to serve areas covered by an existing cable system, *id.* § 8A-3), the County may require the applicant to provide "other information necessary for the County" to evaluate the requested franchise. *Id.* § 8A-8(d)(13). Thus, the Ordinance leaves it up to County officials to decide on an *ad hoc* basis and without any standards what information any particular applicant must submit. Similarly, this provision of the Ordinance authorizes County decisionmakers repeatedly to demand additional information from a prospective franchisee to satisfy new (and even ever-changing) information requests. *See, e.g.*, *id.* § 8A-8(i) (providing that the County Executive "must decide whether to accept or reject the application for filing" without specifying the grounds on which such a decision must be made). Under the Ordinance, moreover, the applicant bears "the burden to demonstrate compliance with all application requirements," and the County is free to withhold a franchise from any applicant who fails to meet its information demands. *Id.* § 8A-8(a); *see also id.* §§ 8A-8(b)(5); 8A-8(h).

58. The Ordinance endows local officials with similarly broad discretion with respect to their determination of whether to approve or to deny a franchise request. Among other things, under the Ordinance, County officials must consider not only the applicant's technical and financial capabilities, *id.* § 8A-9(e)(2), (e)(3), but also "the applicant's character" and "whether the [applicant's] proposal will serve the public interest," *id.* § 8A-9(e)(1), (e)(5); *see also id.* § 8A-9(f)(2) (for an "overbuild" proposal, requiring the County to consider "the effect of the overbuild on the public"). Nowhere does the Ordinance define these vague and malleable terms. Thus, County officials are empowered to withhold franchises based on their own subjective

- 22 -

judgments about the meaning of the "public interest" or the kind of "character" they believe an applicant may possess.  The Ordinance, moreover, which requires the Executive to "propose to grant or deny the franchise application," does not specify the grounds on which the Executive must base his proposed decision.  *See id.* § 8A-9(g); *see also id.* § 8A-8(i) (with respect to "overbuild" franchises, preserving the Executive's authority "to request additional information later or to recommend, based on *any grounds* after full review of the application, that the Council deny the application" (emphasis added)).

59.     The Ordinance, moreover, lacks firm deadlines to ensure prompt adjudication of franchise requests.  For the first cable entrants entering an area, for example, the Ordinance prescribes no time limits governing when the County Executive must decide whether an application is complete or whether the franchise should be granted or denied.  In addition, although the Executive's recommendation is deemed approved if the County Council fails to act within 60 days after receiving it, the Council may extend that deadline unilaterally.  *Id.* § 8A-29(d).  For "overbuild" franchises, the Ordinance sets forth certain time lines for the completion of the review process, *id.* §§ 8A-8(i), 8A-9(g), but County officials can easily circumvent these ostensible deadlines.  For example, under the Ordinance, the County Executive can continuously reject an application as incomplete, sending it back time and again for additional data updates, and thereby delay a decision indefinitely.  *See id.* § 8A-8(i).

60.     County officials also enjoy standardless discretion to set fees in connection with the processing of a franchise application.  In addition to a fixed $25,000 application fee, franchisees must pay a "franchise acceptance fee" that County officials establish in their sole discretion.  *Id.* §§ 8A-8(b)(2), 8A-9(l); Code of Montgomery County Regulations, Chapter 8A Cable Communications ("Cable Modem Regulations") § 08A.08.01.02(1)(a) (attached as

Exhibit 2).  Although the Ordinance provides that the total "acceptance fee" may not exceed the

County's costs in considering the application, nowhere does the Ordinance set forth standards for

determining what costs may be considered or how they must be calculated.  *See* Ordinance § 8A-

9(l).  The Ordinance neither specifies what kinds of costs the County properly can impose on

franchise applicants nor prescribes any limits on the fees that the County can generate.  As a

result, County officials may choose on a case-by-case basis to impose all of its costs, none of

them, or something in between—and then refuse a franchise to a party failing to pay the costs

assessed.  *See id.* (voiding a franchise grant if the applicant does not pay the franchise acceptance

fee within 30 days after the County notifies the applicant of the amount required).

      61.     Under the Ordinance, County officials enjoy similarly broad discretion with

respect to the substantive conditions they may impose on the grant of a cable franchise.  For

example, in cases in which the County Executive recommends that a franchise agreement be

approved, the Ordinance vests the County Council with authority to grant the franchise "with

conditions, which may modify or override any provision of the proposed franchise agreement,"

although the scope and content of such conditions are nowhere defined.  *Id.* § 8A-9(k)(1)(B); *see

also id.* § 8A-9(k)(2)(C) (where Executive recommends denial of a franchise, Council may

"grant the franchise with any conditions that the Council determines are necessary to protect and

promote the public interest").  In addition, while the Ordinance establishes "minimum

requirements" with respect to the number of channels an operator must designate for particular

purposes, the Ordinance further states that the "County may require that the franchise exceed

[those] minimum requirements"—without specifying any standards for determining what

circumstances would trigger such additional requirements or what additional requirements may

be imposed.  *Id.* § 8A-11(b); *see also id.* § 8A-11(a)(1), (2) (specifying minimums for certain

types of channels an operator must provide without defining how or when the County can exceed

these minimums); *id*. § 8A-9(c) (authorizing the County to "condition the grant of a franchise on

. . . the performance of other specific obligations and specify that the failure of the franchisee to

comply with the condition will void the franchise without further action by the County" but

setting forth no definition of the nature or scope of the "specific obligations" that the County

may impose).  The Ordinance also allows the County to require franchisees to "contribute to

capital costs for access studios and related equipment and facilities," *id*. § 8A-11(a)(2), and to

provide "[s]ervice to all public buildings . . . without charge," *id*. § 8A-11(a)(4), without defining

when or how County officials may exercise that authority.  County officials can further require

franchisees, among other things, to secure "any additional types of insurance and coverage

amounts as the County may require" beyond the basic workmen's compensation and liability

insurance mandated by the Ordinance.  *Id*. § 8A-10(a)(4).  At the same time, the Ordinance

requires cable franchisees to purchase a bond "of a type and in a sum specified in the franchise

agreement as necessary to ensure the faithful performance and discharge of obligations imposed

by law and the franchise agreement."  *Id*. § 8A-10(b) (also requiring that the bond "not be less

than $250,000" with no prescribed maximum).  And the Ordinance requires that the insurance

policies and the performance bond be "in a form approved by the County Attorney."  *Id*. §§ 8A-

10(a)(4), 8A-10(b).  These provisions do not identify what kinds of forms the County Attorney

would find suitable.

      62.     The Ordinance also dictates how cable operators are permitted to communicate

with their customers.  Franchisees must provide each subscriber with information about their

services, complaint procedures, and other policies.  *Id*. § 8A-14(d).  But rather than allow the

franchisee to decide how best to communicate these matters, as the First Amendment entitles

them to do, the Ordinance requires the operator to submit proposed forms to the County *before* distributing them to subscribers. *Id.* Nowhere does the Ordinance explain the need for such an extraordinary measure, limit the time in which the County must review proposed communications, or prescribe standards guiding the County's exercise of its pre-approval authority.

63.     Where the Ordinance does articulate objective standards with respect to the terms under which a cable provider will be granted a franchise, it does so in a manner that would extend the County's jurisdiction beyond the regulation of cable services.

64.     For example, the Ordinance requires cable providers to pay franchise fees on *all* of their gross revenues—not just those generated from cable television operations. Specifically, the Ordinance provides that a franchisee must pay 5% of gross revenues derived "from the operation of its cable system," *id.* § 8A-12(a), and defines "cable system" to include a Title II telecommunications facility "to the extent that it is used in the transmission of video programming directly to subscribers," *id.* § 8A-3. The County's cable regulations definitively interpret this language as bringing within the definition of "cable system" *all* facilities of a Title II provider *if* such facility is used to transmit video programs. Cable Modem Regulations § 08A.02.01.03(2) (defining a "[c]able [s]ystem" to include a facility of a Title II common carrier "if such facility is used in the transmission of video programming directly to [s]ubscribers"). The County's proposed franchise agreement with Verizon as well as its existing agreements with Comcast and RCN also reflect this interpretation. Thus, the Ordinance, as definitively interpreted by the County, requires cable providers to pay franchise fees on all of the revenue they earn from cable, telephone, Internet access, and any other communications services they choose to sell in the County using their networks.

- 26 -

65.     In addition to the Ordinance, the County has adopted extensive administrative regulations that govern cable operators in the County.  In particular, the County's regulations purport to regulate "cable modem service," which the regulations define as the "provision of internet access over the Cable System."  Cable Modem Regulations § 08A.02.01.03(1).  These cable modem provisions broadly regulate Internet access service.  For example, the regulations prescribe what providers can charge for unusual installations, *id.* § 08A.02.01.04(a)(1); establish detailed requirements for telephone and office availability including, for example, a requirement that customers "receive a busy signal less than three percent (3%) of the time," *id.* § 08A.02.01.04(b)(3)(B); and establish detailed, specific requirements for scheduling and completing service including, for example, a requirement that 95% of installations be completed within seven days after an order is received, *id.* § 08A.02.01.04(c)(1).

## IV.     VERIZON'S EFFORTS TO OBTAIN A CABLE FRANCHISE FROM MONTGOMERY COUNTY

66.     Verizon's effort to secure a franchise to provide cable service in Montgomery County began on May 19, 2005, when Verizon representatives met with County officials to discuss the terms of a mutually acceptable agreement.  Verizon representatives made a presentation on how FiOS TV would operate in the community and told County officials that it had begun to prepare a formal franchise application that it would file with the County pursuant to the Ordinance's application procedures.  At the May 19 meeting, Jane Lawton, the Administrator of the Office of Cable and Communication Services in the County's Department of Technology, and Jerry Pasternak, Special Assistant to the County Executive, told Verizon that it should not file such an application but instead should wait until County negotiators had approved the principal terms of a franchise agreement before doing so.  As the County stated in a recent

submission to the FCC, it was "[a]greed" at the May 19 meeting that "Verizon would delay filing an application pending progress in the negotiations."

67.     In keeping with the County's direction not to file a formal application, on June 7, 2005, Verizon sent a draft franchise agreement to County officials describing in detail the services it intended to offer.  The franchise agreement met, and in many instances exceeded, the minimum requirements that federal law prescribes.

68.     The County flatly rejected Verizon's proposal.  Throughout the ensuing negotiations, County officials demanded that Verizon conform in all material respects to the terms of the franchise agreement previously executed by the County with Comcast, the incumbent cable operator.  The Comcast agreement contains numerous provisions that exceed the limits provided in federal law.

69.     For example, in response to Verizon's June 7 draft agreement, County officials stated that the County would not accept any franchise proposal that failed to authorize the County to exercise jurisdiction over the construction, operation, and maintenance of Verizon's mixed-use network.  County officials relied upon the franchise agreements with Comcast and RCN, both of which grant the County broad authority over network construction, operation, and maintenance, notwithstanding Verizon's different status as a telecommunications provider with a statewide franchise.  County officials emphatically and repeatedly rejected Verizon's position that the County's jurisdiction did not extend to every aspect of Verizon's FiOS network.

70.     On June 23, 2005, the County's attorney sent a proposed agreement to Verizon ("County Franchise Agreement") (attached as Exhibit 3).  The agreement included numerous provisions that violate the federal Communications Act.  For example, it requires Verizon to pay 3% of its gross revenues to fund PEG and I-Net activities, County Franchise Agreement

§ 7(b)(1), to provide free cable service to County buildings and non-profit entities, *id.* § 7(g)(1), and to designate 38 PEG channels for the County's use, *id.* § 7(a)(1), (a)(5).

71.     Verizon met with County officials on multiple occasions during the summer and fall of 2005 in an effort to negotiate a reasonable agreement.  At each meeting, County officials, acting on behalf of the County, insisted on illegal demands.  For example, in a July 15, 2005, meeting, County officials indicated that, in addition to a 5% franchise fee, Verizon would have to pay a "franchise acceptance fee" that would cover all of the County's costs of negotiating a franchise with Verizon, including attorneys' fees and consulting expenses.  Upon information and belief, the agreement between Comcast and the County provided that Comcast would be required to pay up to $675,000 as such a fee.  Upon information and belief, RCN was required to pay the County $150,000 as such a fee.  When Verizon asked the County to agree to a cap on these open-ended fees, County officials indicated that the County was not interested in negotiating such a limitation because costs had exceeded a ceiling the County had accepted in a previous franchise negotiation.

72.     On August 9, 2005, Lawton, acting on behalf of the County, sent a letter to Verizon stating that the County Executive was prepared to submit the County Franchise Agreement to the County Council with only "relatively modest changes."  Although Lawton's letter acknowledged the need to make some revisions to reflect Verizon's technology and other business issues, she made clear that any changes would be limited to "fine-tuning."  The letter stated that the County saw "little if any justification for deviating from the material terms of the agreements that the County now has in place with Comcast and RCN . . . ."  The letter concluded by stating that the County thought "it ought to be possible to reach the terms of a final agreement

relatively quickly," but only if Verizon would accept the terms of the existing agreements without material changes.

73.     In subsequent communications, County officials continued to insist that Verizon agree to the terms of the County Franchise Agreement without material changes.  For example, in a September 2005 conference call, County officials indicated that the County would not agree to any franchise agreement that did not grant the County authority to regulate the construction, operation, and maintenance of Verizon's telecommunications network.  County officials also refused to discuss a cap on fees that Verizon would have to pay the County for its attorneys' fees and consulting costs.

74.     On October 31, 2005, Verizon sent the County a revised draft of its proposed franchise agreement.  In this revised draft, Verizon proposed to accept various demands made by the County, despite their invalidity, in an effort to obtain County approval.  For example, Verizon's revised draft incorporated the County's demand that Verizon pay the County 3% of its gross revenues annually for PEG and I-Net purposes.  Although the Cable Act prohibits localities from requiring new entrants to make cash payments of this kind for either PEG or I-Net activities, Verizon agreed to the County's demand, notwithstanding its invalidity, to move the parties expeditiously toward a final agreement.

75.     The County flatly rejected Verizon's compromise draft in the parties' November 10, 2005 meeting.  In the same meeting, the County flatly rejected Verizon's position that local officials lack authority to regulate the company's broadband Internet services.

76.     In the November 10, 2005 meeting, legal counsel for the County asked Verizon to prepare a document comparing its proposal with the terms contained in the County Franchise Agreement.  The County's lawyer indicated that such a document would help identify the

parties' points of disagreement and would enable the County to respond further to Verizon's positions. On January 11, 2006, Verizon sent this document to the County's attorney, setting out in minute detail the differences between the two sides' proposals. Nearly two months passed, and the County did not respond.

77.     In February, while Verizon still waited for a response from the County, the County submitted its views about the progress of the negotiations to the FCC. In its comments, the County stated that it "would readily agree at once to have Verizon . . . provide service under similar terms and conditions" as those contained in the franchise agreements with Comcast and RCN, but that Verizon faces indefinite delay if it wishes to obtain a franchise agreement that is not a "clone" of those agreements. Those comments stated that a major sticking point in the negotiations was the County's insistence that Verizon submit to County regulation of its non-cable services, including its broadband Internet access services, as part of any franchise agreement.

78.     On March 29, 2006, Verizon representatives met with County officials, again in an effort to move toward a compromise agreement. County officials gave Verizon representatives a document setting out the County's position. That document reiterated the County's view that it could exert regulatory control over Verizon's physical network and could require Verizon to pay fees and make in-kind contributions that exceed the limits of federal law.

79.     At the March 29 meeting, County officials also made clear that Verizon would not be able to obtain a final franchise until November or December at the earliest—at least a full one-and-one-half years after the start of the negotiation process. County officials also explained that once they and Verizon reached agreement on the terms of a cable franchise, the agreement would have to go through several more steps before Verizon would be permitted to provide cable

service.  First, after the County negotiators and Verizon agreed on the terms of a franchise agreement, the agreement would be made available to the public for 30 days.  The County Executive would then hold a hearing on the agreement.  After that, the County Executive would send the agreement to the Council, and it would be introduced at a Council meeting.  The Council's separate legal counsel would review the document, and the Council would hold work sessions on the agreement.  The Council's Management and Fiscal Policy Committee would then hold a hearing and a vote on the agreement.  Finally, the agreement would be presented to the full Council for a vote.  County officials also indicated that the process following an agreement between County officials and a potential cable franchisee normally takes about four months, barring any delays.

80.     The parties met again on April 3, 2006.  At that meeting, Clifford L. Royalty, an Associate County Attorney, again insisted that the County could exercise regulatory jurisdiction over Verizon's telecommunications network once Verizon began providing cable service in the County.  Royalty also stated that the County would have the power, by virtue of its grant of a cable franchise, to tell Verizon where to place its facilities.

81.     Royalty further insisted that in order to obtain a franchise, Verizon would be obligated to match the material terms of Comcast's franchise agreement.  Royalty told Verizon that the County was prepared to litigate this demand with Verizon and that the County would prefer to defend its position in court against Verizon now rather than have to defend the terms of an agreement with Verizon in a future suit brought by Comcast.

82.     County officials also reiterated at the April 3 meeting that Verizon would be responsible for paying all of the County's costs of negotiating and approving a franchise agreement.  County officials indicated that these costs would include not only the attorneys' fees

incurred by the County negotiating team, but also the costs of separate outside counsel for the County Council and the participating municipalities, as well as engineering consulting and financial consulting expenses.  County officials again refused to cap those fees, even though the County Franchise Agreement contemplates a ceiling (albeit an undefined one).  *See* County Franchise Agreement § 2(h)(5) (requiring franchisee to reimburse the County and participating municipalities for their costs "up to $_____").

83.     The parties met for the last time on April 21, 2006.  At that meeting, County officials reiterated that Verizon would have to submit to the County's requirements—both for regulatory authority over Verizon's mixed-use network and for fees and services—in order to obtain a cable franchise.  Indeed, rather than responding constructively to Verizon's position that the Cable Act forbade many of the demands for fees and services the County had requested up to this point, the County *added* yet new demands for fees and services that Verizon would have to satisfy if it wanted to provide cable service in the County.  The County set forth many of these demands in writing.

84.     At the April 21 meeting, the County affirmed that Verizon would have to submit its entire telecommunications network to the County's regulatory jurisdiction.  Although County officials offered to modify the language of the County Franchise Agreement, Royalty reiterated the position that its language, as well as provisions in the Ordinance and Cable Modem Regulations, would give the County regulatory authority over the entirety of Verizon's facilities once used to provide cable service.  In addition, Lawton and Alisoun Moore (the Chief Information Officer in the County's Department of Technology Services) stated repeatedly that the County Council had told the County Executive not to propose any legislative changes to the

Ordinance or the Cable Modem Regulations until *after* the November 2006 elections when the incumbent Council Members face re-election.

85.     The County made other demands in the April 21 meeting.  For example, County officials reiterated that Verizon would have to designate a large amount of its system's cable spectrum for PEG purposes.  The County required that Verizon make available to the County 78 megahertz of channel capacity, or its equivalent, for PEG programming.  This amount of capacity translates into approximately 13 analog channels, and if standard compression technology is used, 65 digital channels.  By requiring Verizon to provide a fixed amount of bandwidth—rather than a fixed number of PEG channels—the County ensured that it could keep capacity for its own use even if Verizon is able to deliver PEG programming more efficiently, using less bandwidth.

86.     County officials also reiterated the County's demand for Verizon to contribute 3% of its revenues purportedly to support PEG and I-Net capital costs, in addition to the franchise fee payment of 5% of its revenues, even though the County already has more than enough revenue to satisfy its needs for capital expenditures to support PEG.  In fiscal year 2007, the County's cable fund will have a surplus of $962,000.  Upon information and belief, yet of its $15.5 million in cable resources, the County plans to spend only $1.1 million on PEG equipment—only 7% of total expenditures—notwithstanding additional available funds.

87.     County officials also affirmed at the April 21 meeting that Verizon would have to assume a burden to provide free cable service equivalent to that borne by Comcast and RCN. County officials told Verizon that it would have to agree to provide, upon the County's request, cable service to "each public and non-profit educational institution, each County, State or municipal and agency building, each facility owned by or leased to the County, each non-profit

- 34 -

health care institution with patient beds, and each multi-purpose Community Center, within the Franchise Area, as shall be designated by the County from time to time." County Franchise Agreement § 7(g). Lawton stated that she would not recommend to the County Council a franchise agreement that did not require Verizon to bear obligations equivalent to those borne by the existing cable operators, and that, even if she did, the Council would reject such an agreement.

88.     At the April 21 meeting, County officials stated that Verizon would also have to assume obligations for other kinds of goods and services equivalent to those that the existing operators provide. Lawton began by suggesting that Verizon meet this support obligation in the form of 100 wireless "hot spots," which are wireless connections that allow users to access the Internet. When Verizon resisted this request, the County stated that Verizon could pay the equivalent retail value of the T1 and T3 lines (wires to provide high-speed Internet access) that RCN had provided.

89.     Also at the April 21 meeting, the County confirmed that Verizon must pay a "franchise acceptance fee" that covers 100% of the County's costs of reviewing Verizon's franchise request, including attorneys' fees. County officials reiterated that they would not agree to a cap on these fees.

90.     County officials also told Verizon that if it wished to terminate its franchise within the first three years of the franchise term—that is, to stop conveying speech over its network—Verizon would have to forfeit a $2 million performance bond it would be required to provide the County. Verizon, moreover, would not be permitted to refrain from providing cable service in the County under any circumstance unless it stops providing cable service throughout the entire Washington, D.C. metropolitan area.

**THE COUNTY'S CABLE LAWS, AND ITS APPLICATION OF THOSE LAWS TO
VERIZON, VIOLATE FEDERAL AND STATE LAW.**

91.    The County has violated Verizon's constitutional and statutory rights.  The

County is a "person" within the meaning of 42 U.S.C. § 1983, and all of the actions alleged

herein were taken under "color of law."  Through its unlawful actions, the County has actually

and proximately caused the deprivation of Verizon's constitutional and statutory rights, and

continues to deprive Verizon of those rights, through the County's official policy, custom, usage,

or practice and through actions taken by County officials vested with final policymaking

authority to act for the County.

**I.     THE COUNTY'S CABLE ORDINANCE, AND ITS APPLICATION OF THE
        ORDINANCE TO VERIZON, VIOLATE THE FIRST AMENDMENT.**

92.    The First Amendment to the United States Constitution provides that "Congress

shall make no law . . . abridging the freedom of speech, or of the press."  This proscription

applies to the states and their local subdivisions through the Fourteenth Amendment.

93.    Cable providers engage in and transmit speech and are therefore entitled to the

protection of the speech and press provisions of the First Amendment.  *Turner Broad. Sys. v.

FCC*, 512 U.S. 622, 636 (1994); *City of Los Angeles v. Preferred Commc'ns, Inc.*, 476 U.S. 488,

494 (1986).  Cable providers express speech not only through their original programming, but

also through their editorial decisions over which stations and programs to disseminate.

**A.     The Ordinance's Cable Franchise Regime Operates as an Unlawful Prior
        Restraint.**

94.    Because Montgomery County's cable franchise system requires cable providers to

obtain permission from local authorities *before* engaging in protected expression, it operates as a

prior restraint on speech. *See Forsyth County, Ga. v. Nationalist Movement*, 505 U.S. 123, 130 (1992). Prior restraints are presumptively invalid and are subject to exacting judicial scrutiny. *Id.*; *Cox v. City of Charleston*, 416 F.3d 281, 284 (4th Cir. 2005).

95.     To pass constitutional muster, local permitting schemes that subject speech to the advance approval of government administrators must spell out narrow, objective standards that limit local officials' discretion in deciding whether to grant or withhold the permit and what conditions to attach to the permit. Permitting laws also must establish standards that objectively determine how much the applicant must pay for the permit. These standards ensure that those empowered to block the expression of protected speech do not "roam essentially at will, dispensing or withholding permission to speak . . . according to their own opinions" about the expressive activity being licensed. *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 153 (1969). Because the mere existence of a standardless licensing scheme threatens to chill protected expression, it may be attacked as facially inconsistent with the First Amendment.

96.     The First Amendment's free speech guarantee also requires that local authorities issue permitting decisions in a timely manner. Any undue delay in the process of permitting the exercise of free speech rights unconstitutionally suppresses protected speech. Further, the power to delay action indefinitely on an application to speak gives a licensing authority the effective ability to deny that application, and therefore the power to delay poses the same threats of censorship and chilling as does the power to exercise standardless discretion.

97.     Montgomery County's Ordinance unconstitutionally endows local officials with unfettered discretion over cable franchises. Among other things, the Ordinance authorizes the County to require applicants to provide any information that County officials wish. *E.g.*, Ordinance § 8A-8(d)(15). It requires local decisionmakers to consider undefined and malleable

criteria such as the "applicant's character" and "whether the proposal will serve the public interest" when determining whether to grant or withhold a franchise.  *Id.* § 8A-9(e)(1), (e)(5).  It permits local officials to charge applicants for the costs of reviewing franchise applications but prescribes no standards determining the types or amounts of fees that the County may charge. *Id.* § 8A-9(l).  The Ordinance also allows local authorities to condition franchises on any demands they see fit, including demands that federal statute expressly forbids.  *See, e.g.*, *id.* § 8A-11(b).  And the Ordinance fails to ensure that the County decides on franchise requests in a timely fashion.

98.     Under the First Amendment, a local law may not vest franchising authorities with this kind of boundless authority, and the Ordinance's provisions governing the franchise application and review process are therefore unconstitutional on their face.

**B.     The Ordinance's Requirement that Cable Operators Obtain Prior Approval of Communications with Customers Is an Unlawful Prior Restraint.**

99.     The Ordinance provides that the "County must approve all forms describing customer service policies and procedures before they are distributed to subscribers."  Ordinance § 8A-14(d).  This Ordinance provision violates the First Amendment.

100.     First, no constitutional basis exists for imposing the prior restraint of an advance-review requirement.  The County's interest in ensuring that customers receive accurate notices from their cable providers can be achieved by the enforcement of laws prohibiting misleading communications.

101.     In addition, Ordinance section 8A-14(d) lacks the procedural safeguards necessary to avoid the dangers of a censorship system.  *See Freedman v. Maryland*, 380 U.S. 51, 58 (1965).  Any restraint prior to judicial review may be imposed for only a brief, specified

period during which the status quo must be maintained, expeditious judicial review must be available, and the censor must bear the burden of going to court and the burden of proof before a judicial tribunal. *Id*. at 58-59. And any permitting scheme must contain narrow, objective standards that confine the permitting authority's discretion.

102. Ordinance section 8A-14(d) establishes no time limits on the County's decisionmaking process and no procedures for obtaining a prompt judicial determination of the validity of an adverse County determination. It does not require the County to bear the burden of initiating judicial proceedings or the burden of proof in court. Ordinance section 8A-14(d) also prescribes no objective standards to guide County officials' decisions. Indeed, it gives no indication at all as to what criteria the County might use to determine whether a customer communication is appropriate for distribution. Therefore, Ordinance section 8A-14(d), on its face, violates the First Amendment.

## C.     The County's Application of the Ordinance to Verizon Violates the First Amendment.

103. Beyond the constitutional infirmities of the Ordinance that are apparent on its face, Montgomery County officials have taken a number of actions with respect to Verizon's request for a cable franchise that violate the First Amendment.

104. First, the County has violated—and continues to violate—Verizon's First Amendment rights by unduly delaying approval of Verizon's franchise request. As noted, any undue delay in the process of permitting the exercise of free speech rights unconstitutionally suppresses protected speech. Each day of continued delay by the County deprives Verizon of its constitutional right to speech.

105.    Second, the County has assessed impermissible fees and restrictions that violate Verizon's free speech rights.  The County's demands that Verizon make expensive contributions, provide excessive PEG channel capacity, and submit to onerous regulations impose unlawful burdens on Verizon's free speech rights.  These demands place an unjustifiably heavy burden on Verizon's freedom of expression and are therefore inconsistent with the First Amendment.  They do not further important or substantial governmental interests, and they burden more speech than is necessary to further any legitimate governmental interests.  They also constitute an invalid time, place, and manner requirement that fails to leave open ample alternatives of communication.  Because these requirements are invalid under state and federal law, the County's decision to condition the grant of a cable franchise on Verizon's acceptance of these requirements also constitutes an unlawful prior restraint.

106.    Third, the County has violated Verizon's First Amendment rights by compelling it to continue speaking even if wishes to refrain from speaking.  County officials have required Verizon to forfeit a $2 million performance bond if it wishes to terminate its cable service in the County within three years of obtaining a franchise.  The County also has told Verizon that it must agree to continue providing cable service in the County unless Verizon agrees to stop providing service *everywhere* in the Washington, D.C. metropolitan area.  These requirements violate Verizon's First Amendment right to refrain from speaking; they compel Verizon to continue speaking.  These requirements are unlawful because they do not further important or substantial governmental interests and burden more speech than is necessary to further any legitimate governmental interests.

II.     **THE COUNTY'S CABLE ORDINANCE AND REGULATIONS, ON THEIR FACE, VIOLATE FEDERAL AND STATE LAW.**

A.     **Montgomery County's Cable Ordinance and Regulations Impermissibly Attempt to Regulate Telecommunications Services and Facilities, and Broadband Services, in Violation of the Federal Communications Act and Maryland Law.**

107.     The Communications Act prohibits local franchising authorities from exploiting their control over the cable franchising process to seize regulatory authority over Title II telecommunications services and facilities and Title I information services.  Despite these prohibitions, Montgomery County is attempting to do just that.

108.     The Ordinance, as definitively interpreted by the County, requires cable operators to pay franchise fees on all of the revenue they earn from cable, telephone, Internet access, and any other telecommunications or information services they choose to sell in the County.  Ordinance § 8A-12(a).  This violates federal law and is preempted.  *See* 47 U.S.C. § 542(b) (stating that annual franchise fees "shall not exceed 5 percent of [a] cable operator's gross revenues derived . . . from the operation of the cable system *to provide cable services*" (emphasis added)); *see also id.* § 542(g)(1).

109.     The Ordinance also purports to regulate various activities of a franchisee, without limiting such regulation to the franchisee's provision of cable service.  For example, the Ordinance defines a "[s]ubscriber" as a person who legally receives cable service "or other product or service provided by a franchisee."  Ordinance § 8A-3.  The term "[o]ther product or service" is defined as any service that uses a facility occupying a right-of-way that the County contends is under the franchise, *id.*, and thus would include telecommunications and information services.  The Ordinance further imposes various obligations on franchisees in their dealings with their "subscribers," including requiring a franchisee to "have a uniform rate structure"; to

maintain a business office within the County; to provide information (approved by the County in advance) regarding rates, services, and other policies; and to ensure the provision of continuous service to subscribers under certain circumstances.  *Id.* §§ 8A-15(a), 8A-14(a), 8A-14(d), 8A-26. None of these requirements is limited to the franchisee's provision of cable service, and thus all would extend to the franchisee's provision of telecommunications and information services.  The Cable Act, however, does not permit a locality to extend its franchising jurisdiction to encompass the regulation of non-cable services.  *See, e.g.*, 47 U.S.C. § 541(b)(3)(B) (prohibiting a locality from imposing any requirement as part of the cable franchising process that "has the purpose or effect of prohibiting, limiting, restricting, or conditioning the provision of telecommunications services by a cable operator"); *id*. § 541(b)(3)(D) (stating that local franchising authorities may not "require a cable operator to provide any telecommunications service or facilities . . . as a condition of the initial grant of a franchise . . ."); *id* § 253(a); *id*. § 544(b)(1) (stating that local franchising authorities "may not . . . establish requirements for . . . information services").

110.   The Ordinance also establishes a "Cable Compliance Commission," whose purpose is "to adjudicate subscriber complaints involving customer cable service *or any other product or service*."  Ordinance § 8A-31A(a) (emphasis added).  Under the Ordinance's definition of "other product or service," the Compliance Commission would have authority to adjudicate customer disputes involving telecommunications and Internet access services.  *Id*. § 8A-3; *see also id*. § 8A-31A(b)(2) (stating that one of four mandatory members of Commission must be "a broadband Internet service subscriber").  The Compliance Commission is empowered to, among other things, "require a franchisee to provide a refund to a [subscriber]" and "[o]rder a franchisee to pay damages of up to $1,000 to a person injured or aggrieved by the franchisee's actions," a limit which "applies separately to each violation."  *Id*. § 8A-31A(f).  By regulating a

cable provider's provision of telecommunications and Internet access services, these Ordinance

provisions violate and are preempted by 47 U.S.C. §§ 541(b)(3)(B) and (D), 253(a), and

544(b)(1).

111.    The County also has promulgated regulations that purport to regulate "cable

modem service," defined as the "provision of internet access over the Cable System."  Cable

Modem Regulations § 08A.02.01.03(1).  These regulations broadly control Internet access

service, and in some cases require the provision of telecommunications facilities over which

Internet access service is provided.  For example, the regulations prescribe what providers can

charge for unusual installations, *id*. § 08A.02.01.04(a)(1); establish detailed requirements for

telephone and office availability, such as a requirement that customers "receive a busy signal less

than three percent (3%) of the time," *id*. § 08A.02.01.04(b)(3)(B); establish detailed, specific

requirements for scheduling and completing service including, for example, a requirement that

95% of installations be completed within seven days after an order is received, *id*.

§ 08A.02.01.04(c)(1); and contain detailed requirements for the location of "drops," or points of

entry into residential buildings, for standard and non-standard installations, *id*.

§ 08A.02.01.04(a)(1)-(3).  These provisions violate and are preempted by 47 U.S.C. § 544(b)(1),

which prohibits local franchise authorities from "establish[ing] requirements for . . . information

services," and 47 U.S.C. § 541(b)(3)(D), which prohibits franchise authorities from "requir[ing]

a cable operator to provide any telecommunications service or facilities . . . as a condition of the

initial grant of a franchise."

112.    The Ordinance would also allow the County to acquire the entirety of a

franchisee's mixed-use network "upon the recommendation of the County Executive and with

the approval of the Council."  Ordinance § 8A-25(a); *see also id.* §§ 8A-25(b), 8A-24(f)(2).  In

- 43 -

so doing, the Ordinance would preclude a franchisee from providing telecommunications and information services altogether.  Title VI prohibits localities from requiring a cable operator "to discontinue the provision of a telecommunications service" under any circumstances.  47 U.S.C. § 541(b)(3)(C)(i); *see also id.* §§ 541(b)(3)(B), 253(a).  The County's attempt to leverage its cable franchise authority to acquire the entirety of a cable provider's network in the future violates and is preempted by the Communications Act.

113.   The Ordinance also establishes construction and technical standards that purport to cover the entirety of a franchisee's integrated telecommunications-data-cable network. Ordinance §§ 8A-17 (construction standards); 8A-18 (technical standards).  These provisions violate federal law.  First, when granting a cable franchise, the County may regulate only a "cable system," and not other aspects of a mixed-use network.  The Cable Act defines a "cable system" generally as a facility that is designed to provide cable services.  47 U.S.C. § 522(7). But the statute expressly excludes from that definition "a facility of a common carrier which is subject, in whole or in part, to the provisions of subchapter II of this chapter," i.e., a telecommunications carrier such as Verizon.  With regard to Title II facilities, the Cable Act specifies that those facilities are not a cable system, "except that such facility shall be considered a cable system . . . *to the extent* such facility is used in the transmission of video programming . . . ." *Id.* (emphasis added).  By imposing construction and technical standards on the entirety of a franchisee's Title II telecommunications network, rather than on those parts of the network that are solely dedicated to the provision of cable services, the Ordinance and its implementing regulations violate the Cable Act's narrow definition of "cable system."  Further, imposing such standards has "the purpose or effect of prohibiting, limiting, restricting, or conditioning the provision of telecommunications service by a cable operator." *Id.* § 541(b)(3)(B); *see also id.*

§ 253(a). Some of the Ordinance's standards also require the provision of telecommunications facilities, in violation of section 541(b)(3)(D). The Communications Act thus prohibits what the Ordinance purports to do.

114. Even if the Ordinance were not preempted by federal law, Maryland law independently preempts the County from regulating intrastate telecommunications services and facilities (except for reasonable police power regulation of the use of rights-of-way already exercised over Verizon's telecommunications facilities) and, to the extent not preempted by federal law, Maryland law preempts the County from regulating broadband Internet access services. *See* Md. Code., Public Utility Cos., §§ 2-112 & 113.

**B.    The County's Ordinance Unlawfully Deprives Cable Providers of their Right to Jury Consideration of Just Compensation Claims.**

115. Under Ordinance section 8A-25, the County enjoys the authority to acquire and operate a private cable system under certain circumstances. Ordinance § 8A-25(a). After County officials decide to seize a cable company's network, the County may force the cable operator to submit any dispute over the "price for the purchase of the system" to the binding decision of a three-person arbitration panel. *Id.* § 8A-25(b). Unlike true arbitration, however, this method of resolving disputes is compelled by the Ordinance; it is not a process agreed upon in a voluntary transaction.

116. By requiring cable providers to submit their takings disputes to the final word of three arbitrators, Ordinance section 8A-25 deprives cable operators of the right to a jury determination of just compensation as guaranteed by the Maryland Constitution. *See* Md. Const. Art. III, § 40.

### III.   MONTGOMERY COUNTY HAS APPLIED THE ORDINANCE IN VIOLATION OF THE FEDERAL COMMUNICATIONS ACT.

117.   The County has expressed its definitive and official position that Verizon must agree to accept various obligations in order to receive a franchise.  County officials have made clear that the County Council will not accept any franchise agreement that does not contain these obligations.

118.   The County initially expressed its demands through the County Franchise Agreement its attorney sent to Verizon on June 23, 2005.  *See* Exhibit 3.  Throughout the course of negotiations with Verizon, County officials have affirmed that many of the requirements embodied in that agreement represent the County's official and final position on particular issues.  County officials told Verizon that the County Executive is prepared to submit the County Franchise Agreement to the County Council with only "relatively modest changes."  In recent comments filed with the FCC, the County again confirmed that it will expeditiously grant a franchise to Verizon only if it is a "clone" of the franchise agreements of the existing providers in the County.  In the parties' March 29, 2006 meeting, County officials gave Verizon a written document again reiterating the County's position.  And in the parties' final negotiating session on April 21, 2006, County officials not only restated its positions in writing but also told Verizon that it could not obtain a franchise without submitting to the County's demands.

### A.   Specific Demands Made by Montgomery County Violate the Communications Act.

119.   Many of the obligations that the County has insisted upon as a condition of granting a franchise to Verizon violate and are preempted by the federal Communications Act. These demands represent the official policy, practice, custom, and usage of the County, and are actions taken by County officials vested with final policymaking authority to act for the County.

120.    The County has required Verizon to agree to pay a 5% franchise fee on its Internet access services.  County Franchise Agreement § 1(s) (defining "gross revenues" to include revenues derived "from the operation of the Franchisee's Cable System . . . to provide cable services"); *id*. § 1(f) (defining "Cable Service" to "include[] the provision of Internet access over the Cable System").  This decision violates 47 U.S.C. § 542, which limits the franchise fee to gross revenues from "cable service," a term which, under federal law, does not include Internet access services.  County officials have acknowledged that it is unlawful to require Verizon to pay franchise fees on revenues from Internet access services and have indicated that the County does not currently intend to enforce this provision of the franchise agreement.  The County has nevertheless insisted on including this unlawful provision to leave open the possibility that the County could, at some point in the future and in its discretion, collect such fees.

121.    The County has required Verizon to pay, in addition to the 5% franchise fee, a "franchise acceptance fee" that encompasses the costs that the County and participating municipalities incur in the franchise review process.  *See* County Franchise Agreement § 2(h)(5).  In particular, the County has required Verizon to pay all of the County's costs of negotiating and approving a franchise agreement, including the attorneys' fees incurred by County officials, the costs of hiring separate outside counsel for the County Council and the participating municipalities, and the County's engineering consulting and financial consulting expenses.  This decision is unlawful under 47 U.S.C. § 542, which caps total assessments at 5% of gross cable revenues.  The franchise fee ceiling's exception for requirements or charges "incidental" to the awarding of a cable franchise does not encompass assessments of this kind or magnitude.  *Id.* § 542(g)(2)(D).

- 47 -

122.    The County has required Verizon, upon the request of the County, to install without charge cable outlets in government and non-profit buildings.  *See* County Franchise Agreement § 7(g)(1).  The County has also required Verizon to provide basic cable service, as well as any equipment necessary to receive that service, free of charge to those buildings.  *Id.* § 7(g)(2).  This requirement, which is in addition to a 5% franchise fee, is unlawful on multiple grounds.

a)    This decision is unlawful because it exceeds the 5% franchise fee that a locality may demand.  47 U.S.C. § 542(b), (g)(1).  No exception to the federal franchise fee cap covers this kind of exorbitant demand.

b)    This decision is unlawful because localities lack authority under the Cable Act to require franchise applicants to provide cable *service*.  *See id.* § 544(a) (providing that localities may regulate the services, facilities, and equipment of cable operators only insofar as the Cable Act permits); *id.* § 544(b) (permitting franchising authorities, "to the extent related to the establishment or operation of a cable system[,] . . . [to] establish requirements for *facilities and equipment*," without authorizing localities to establish requirements for "services" (emphasis added)).

c)    This decision also violates the Cable Act's prohibition against rate regulation by localities absent permission from the FCC.  *Id.* § 543(a)(3) & (4).  By requiring Verizon to provide free cable service to certain locations, the County has prescribed a rate of zero for those recipients.  Montgomery County has neither sought nor received permission from the FCC to regulate cable rates.

123.    The County has required Verizon to provide 100 free wireless "hot spots" to the County, or the cash equivalent, without counting the costs of this requirement against the 5%

franchise fee cap.  To construct and operate these "hot spots," Verizon estimates it will cost over $884,000 in the first year and over $583,000 every year thereafter.  This decision is unlawful on multiple grounds.

        a)      This decision is unlawful because it imposes a franchise fee in excess of the 5% fee that a locality may demand.  *Id.* § 542(b), (g)(1).

        b)      This decision is also unlawful because the Cable Act prohibits local franchising authorities from imposing requirements on cable franchisees that do not relate to the establishment or operation of a cable system.  *Id.* § 544(a), (b).  Neither wireless "hot spots" nor their monetized equivalent has anything whatever to do with a cable system.

        c)      This decision is also preempted by the Cable Act's prohibition against requiring franchisees to provide telecommunications facilities or information services.  *Id.* § 541(b)(3)(D) (providing that "a franchising authority may not require a cable operator to provide any telecommunications service or facilities, other than institutional networks, as a condition of the initial grant of a franchise"); *id.* § 544(b)(1) (providing that a franchising authority "may not establish requirements for . . . information services").  A wireless "hot spot" is a "telecommunications . . . facilit[y]" and provides "information services."  Therefore, localities may not require a cable provider to contribute "hot spots" as a condition of awarding a cable franchise.

        124.      The County has required Verizon to provide 78 megahertz of channel capacity for PEG programming, or its equivalent.  This amount of capacity would allow the transmission of 13 analog channels or, if standard compression technology is used, 65 digital channels.  This decision violates the federal limitation that a local franchise authority may require only an "adequate" amount of channel capacity for PEG use.  *Id.* § 541(a)(4)(B).

125.    The County has required Verizon to pay a fee of 3% of gross revenues each year to fund PEG and I-Net activities over and above the 5% franchise fee.  *See* County Franchise Agreement § 7(b)(1), (b)(2).  This decision violates both the PEG and I-Net provisions of the Cable Act.

a)      Requiring Verizon to provide cash payments for PEG purposes violates the Cable Act's prohibition on requiring PEG obligations beyond channel capacity.  47 U.S.C. § 531(a), (b).  Even if the County had authority to impose PEG obligations beyond channel capacity (which it does not), the 3% grant requirement exceeds the level of PEG support that would be "adequate" to meet the County's needs.  *Id.* § 541(a)(4)(B).  Even if the County had authority to impose PEG obligations beyond channel capacity (which it does not), any funds not going for "capital costs" must count against the 5% franchise fee cap.  *See id.* § 542(g)(2)(C). The County has provided no assurance that it will use the funds contributed by Verizon for PEG capital purposes.

b)      The County's demand for a 3% grant for PEG and I-Net purposes also violates the Cable Act's prohibition on requiring cable providers to provide any I-Net support beyond channel capacity on existing networks.  *Id.* § 531(a).  This demand also conflicts with the Cable Act's 5% cap on franchise fees:  localities can charge operators no more than 5% of gross cable revenues, and no exception exists to exempt payments for I-Net purposes from this cap.

126.    The County has required Verizon to allow the County to exercise jurisdiction over the construction of Verizon's integrated telecommunications-data-cable network.  As noted above, when granting a cable franchise, the County may regulate only a "cable system," and not other aspects of a mixed-use network, and the County's broad definition of "cable system" conflicts with the narrower definition set forth in the Cable Act.  *Id.* § 522(7).  Further, asserting

jurisdiction over a telecommunications provider's mixed-use network has "the purpose or *effect* of prohibiting, limiting, restricting, or conditioning the provision of telecommunications service by a cable operator," *id.* § 541(b)(3)(B) (emphasis added), and of requiring the provision of telecommunications facilities, *id.* § 541(b)(3)(D). *See also id.* § 253(a). The Communications Act thus prohibits the County's attempt to assert jurisdiction over the entirety of Verizon's mixed-use network.

127.    The County has required Verizon to waive its statutory rights to challenge the Ordinance, the franchise process, and many of the illegal conditions imposed through that process. County Franchise Agreement § 2(h)(3). This decision is invalid because it deprives Verizon of its right to challenge unlawful actions by the County and of its right to seek judicial relief for actions by the County that violate Verizon's constitutional and statutory rights. *See* 47 U.S.C. § 555(a); 28 U.S.C. § 1331; 42 U.S.C. § 1983.

128.    Through all of these requirements—for unlawful fees, in-kind benefits, excessive PEG channel capacity, and regulatory authority—the County and its officials have unreasonably refused to award Verizon a competitive franchise. Such an action too violates federal law. *See* 47 U.S.C. § 541(a)(1) (providing that a franchising authority "may not unreasonably refuse to award an additional competitive franchise").

   **B.    <u>Montgomery County's Insistence that the Franchise Agreement with Verizon Conform to the Comcast Agreement Is Unlawful.</u>**

129.    The County has sought to justify its unlawful demands in the name of "parity" with the terms of the agreement the County reached with the incumbent operator Comcast, despite Verizon's different competitive position as a new entrant and its different status as a telecommunications carrier with a statewide franchise.

- 51 -

130.    The franchise agreement between the County and Comcast contains a "most favored nations" clause that impedes the County from providing a franchise to a new entrant on different terms.  The Comcast agreement provides that if the County enters into a franchise agreement with any other cable operator that contains certain terms that are more favorable than those granted to Comcast, then the County will relieve Comcast of comparable obligations once the entrant serves 10% of the residential subscribers previously served by Comcast.  *See* Comcast Agreement § 2(m)(3) (attached as Exhibit 4) (entitled "A Cable Franchise Agreement between Montgomery County, Maryland and SBC Media Ventures, L.P.").  This "most favored nations" provision creates an additional incentive for the County to demand that Verizon agree to accept all of the obligations assumed in Comcast's franchise agreement.

131.    The County's invocation of "parity" and its desire to preserve the special benefits it received from Comcast—indeed, to double them—does not justify its imposition of burdens on Verizon's provision of cable service.  Requiring Verizon, as a new entrant, to assume the same obligations as the incumbent provider is both anti-competitive and contrary to law.

132.    The Cable Act strictly limits the requirements that a locality can impose on an applicant for a cable franchise but also permits the applicant to offer more than this minimum amount.  Incumbent cable operators frequently volunteered to provide the locality benefits far in excess of the minimum requirements of the Act in order to secure the grant of a franchise that was exclusive, *de jure* or *de facto*.  Before Congress outlawed exclusive franchises in 1992, localities almost always concluded that the most effective way to extract value from prospective cable operators was to select a single cable operator within a specified territory.  In this legal context, prospective cable operators competed for the exclusive franchise by offering more favorable terms than the locality is now authorized by federal law to require.  For example,

whereas federal law strictly limits local authority to demand free or discounted cable service, payments to support PEG programming, and construction of I-Nets, cable operators in the monopoly era frequently offered up such perquisites as an inducement to the award of a lucrative exclusive franchise.  The cable operator that succeeded in winning an exclusive franchise could then exploit its monopoly position to recover the costs of these inducements.  In more recent years, incumbent cable operators have continued to volunteer such benefits to preserve their *de facto* monopoly.  Indeed, by negotiating franchise terms that threaten the locality with the loss of these benefits if they are not also imposed on a new entrant, incumbents have managed to use their agreements to provide such benefits to erect a barrier to competitive entry.

133.    The Cable Act allows municipalities to enforce an incumbent's voluntary agreement to provide benefits to the locality.  For example, municipal "enforcement authority includes the authority to enforce any provisions of the franchise for services, facilities, or equipment *proposed by the cable operator* which relate to public, educational, or governmental use of channel capacity, whether or not required by the franchising authority."  47 U.S.C. § 531(c) (emphasis added); *see also id.* § 541(a)(4)(B) (locality may require "adequate assurance" that cable operator will meet PEG commitments).  But the Act does not permit a locality to foist these obligations onto an unwilling entrant.  The imposition on a new entrant of burdens voluntarily assumed by a monopolist creates a barrier to entry and is prohibited by federal law.  Unlike Comcast, Verizon has no assured market position that would guarantee it the ability to recover the costs of such undertakings through monopoly cable profits.

134.    Accordingly, the Cable Act establishes a distinctly different legal regime for incumbents and for new entrants.  Although a locality may enforce obligations voluntarily undertaken by the incumbent cable operator, a locality has no authority to transpose these same

voluntary undertakings to a new entrant.  Rather, the Cable Act narrowly circumscribes the obligations that a locality can impose on a new cable operator.  For example, the only compensation that a locality may demand is that a cable operator pay a franchise fee of up to 5% of gross revenues derived from the provision of cable service.  *Id.* § 542(b).  With respect to PEG contributions, the Cable Act entitles a locality to require a cable operator to provide adequate channel capacity for the dissemination of PEG programming.  *Id.* §§ 531(b), 541(a)(4)(B).  The purpose of these PEG provisions is to give localities the means to meet their need for disseminating PEG programming.  Those needs do not change when a new entrant provides cable service in the locality.  Requiring a new entrant to provide additional payments over and above this "adequate" level, ostensibly in support of PEG programming, just because the incumbent undertook such obligations, bears no connection to the statutory purpose of the PEG requirements.  Rather, it is simply an unlawful attempt to compel the entrant to pay more money for the privilege of obtaining a cable franchise.

135.    Comcast's agreement to furnish enormous benefits to obtain and preserve its monopoly position cannot justify the County's exorbitant and unlawful demand that Verizon furnish identical payments and contributions as a condition of offering FiOS TV to local consumers.

## IV.    MONTGOMERY COUNTY'S AGREEMENT WITH COMCAST VIOLATES THE FEDERAL ANTITRUST LAWS.

136.    Finally, Montgomery County's franchising demands violate the federal antitrust laws.  The Sherman Act prohibits certain "contract[s], combination[s] in the form of trust or otherwise, or conspirac[ies], in restraint of trade or commerce," 15 U.S.C. § 1, as well as "combin[ations] or conspir[acies] with any other person or persons, to monopolize" commerce,

*id.* § 2.  By entering into an agreement with Comcast that ensures that the County will impose on new entrants cost-prohibitive terms and conditions that raise new entrants' costs and forestall entry, and by sharing Comcast's monopoly revenues, the County has violated these provisions of federal law.

### A.    The Relevant Market

137.    The relevant product market includes only cable service, for which there is no adequate substitute.  Although some television programming is available through over-the-air broadcast, cable offers programming, features, and picture quality not available through traditional airwave transmission of television.  Over-the-air television broadcasting is not an effective substitute for cable television service, and the availability of a few over-the-air broadcast stations does not constrain Comcast's ability to charge monopoly prices for cable service.

138.    Direct Broadcast Satellite ("DBS") service is not an adequate substitute for cable service for many consumers.  DBS networks require an unobstructed line of sight between the customer's premises and the serving satellite.  DBS networks, moreover, lack the ability to provide two-way interactive capabilities that consumers increasingly value.  Although DBS providers are limited primarily to the one-way delivery of video, cable providers furnish, over their own networks, broadband Internet access service, voice telephone service, video-on-demand, and other interactive services (such as Games on Demand and local portals) that satellite service cannot match.  As the FCC has determined, the availability of DBS as an alternative to cable does not place an effective constraint on pricing by cable providers.

139.    Even if the relevant product market includes all multichannel video programming distribution ("MVPD") services (which would encompass both cable and DBS), Comcast wields

monopoly power in the relevant market.  DBS providers serve only a small percentage of households in Montgomery County.  Upon information and belief, 75% of the households in the County that purchase MVPD service subscribe to Comcast's cable service.

140.    The relevant geographic market is Montgomery County.  Unless a cable service provider has a franchise to provide service in the County, it cannot offer any competition to the incumbent provider.  Thus, the fact that a cable service provider has a franchise to offer service in a nearby locality does not constrain Comcast's ability to charge monopoly prices in Montgomery County.  Moreover, because the wires and cables used to provide cable service extend to particular locations, and cannot economically be moved, the existence of cable facilities in one locality does not constrain prices in other, nearby localities.  Finally, consumers are not likely to move to a different home in order to obtain different video delivery options.  Thus, the relevant set of options for cable (or other MVPD) service are those available at a consumer's home.

141.    As noted, Comcast has a monopoly position in the provision of cable service in Montgomery County, by virtue of which it is able to and does charge supracompetitive prices for inferior service, and thus exercises monopoly power in the relevant market.  Montgomery County directly participates in Comcast's monopoly by collecting 5% of Comcast's monopoly revenues as a franchise fee.  In addition, Comcast makes various other payments to Montgomery County under their franchise agreement, which constitute a further sharing of Comcast's monopoly revenues with the County.

**B.     Montgomery County Has Delayed Verizon's Entry.**

142.    In May 2005, Verizon first approached Montgomery County to solicit authorization to provide cable service.  Montgomery County has refused to grant such

authorization and continues to delay indefinitely Verizon's entry into the relevant market.

During the entire period that it delays Verizon's entry, Montgomery County has shared and

continues to share in the profits of Comcast's monopoly.

### C.  The Illegal Contract Between Montgomery County and Comcast

143.   The effect of the "most favored nations" provision in the franchise agreement

between Montgomery County and Comcast is to protect Comcast's monopoly position.  The

County and Comcast agreed that Comcast would pay substantial sums and provide substantial in-

kind benefits to the County, including contributions in excess of the fees that the County can

require under the Cable Act, in addition to a percentage of Comcast's monopoly cable revenues.

144.   As enforced by the County, the "most favored nations" provision is anti-

competitive because a new entrant—with no customer base—is placed at a significant cost

disadvantage relative to the incumbent provider if it is forced to meet Comcast's payments.  The

"most favored nations" provision, as enforced by the County, thus raises barriers to entry and

raises rivals' costs, increasing the cost of cable service to County residents and reducing

Verizon's ability to offer aggressively priced service in competition with Comcast.

145.   In executing the "most favored nations" provision and enforcing it to protect

Comcast's monopoly, the County has not acted pursuant to a clear articulation or affirmative

expression of state or federal law.  In fact, as explained above, the County has acted in violation

of federal law by unreasonably refusing Verizon an additional competitive franchise and by

conditioning a franchise on payments far in excess of the limits established by the Cable Act.

The County's actions in this regard have not been authorized by state law, for nothing in

Maryland law allows the County to violate the Cable Act.

146.    Verizon is prepared to promptly provide video service in the County once it obtains the County's permission to do so.  Local consumers would reap enormous benefits from that service.  But the County is using the "most favored nations" provision in its agreement with Comcast as a basis for blocking entry and preserving its share of Comcast's monopoly revenues.

**<u>VERIZON IS ENTITLED TO INJUNCTIVE RELIEF.</u>**

147.    Verizon's harm cannot be adequately remedied at law, and the balance of interests favors injunctive relief.

148.    Verizon will be able to begin providing cable service in the County promptly after obtaining a cable franchise.  The County's unlawful Ordinance, Cable Modem Regulations, requirements, and undue delay, however, are preventing Verizon from doing so.

149.    The County's laws and application of those laws are causing harms that cannot adequately be remedied at law.  The County's laws and actions are restraining Verizon from expressing speech that is protected by the First Amendment, and such harm, by definition, cannot adequately be remedied at law.  In addition, Verizon is losing the opportunity to provide cable service to thousands of County residents.  These lost business opportunities and customer goodwill cannot be adequately remedied by an award of money damages.

150.    The balance of interests favors injunctive relief.  The public would benefit from Verizon's provision of cable services and upgraded voice and data services.  The County would not be burdened, nor would the public be at risk of harm, as the County would continue to be permitted to regulate Verizon's cable service in accordance with federal and state law.

### COUNT ONE
### (Facial Challenge under the First Amendment
### to the Ordinance's Franchise Application and Acceptance Scheme)

151.    Verizon realleges and incorporates herein by reference all previous paragraphs.

152.    The County's Ordinance vests local officials with unfettered discretion over cable franchises and is therefore unconstitutional on its face.  The County's Ordinance also contains no firm time deadlines requiring local officials to act promptly on franchise applications.  The Ordinance, the official law and policy of Montgomery County, has deprived and continues to deprive Verizon of its rights under the First and Fourteenth Amendments to the United States Constitution.

153.    Verizon is entitled to a declaration that the County's franchise application, review, and acceptance regime is inconsistent with the First Amendment and therefore invalid. Verizon is further entitled to an injunction directing the parties to engage in good-faith negotiations over the terms of a franchise agreement, with the objective of reaching agreement within sixty days.  In the event that the parties fail to reach agreement, Verizon is entitled to such additional relief as may be necessary at that time, up to and including an order directing the County to grant Verizon a franchise subject only to the minimum requirements of the federal Cable Act as determined by this Court.

### COUNT TWO
### (Facial Challenge under the First Amendment to Ordinance Section 8A-14(d))

154.    Verizon realleges and incorporates herein by reference all previous paragraphs.

155.    The County's Ordinance requires cable providers to obtain the County's advance approval before disseminating certain customer communications.  This requirement is an invalid prior restraint because the County lacks a constitutionally sufficient justification for imposing it.

The Ordinance fails to prescribe time limits on the County's decisionmaking process or procedures for obtaining a prompt judicial determination of an adverse County decision.  The Ordinance does not require County officials to institute judicial proceedings or bear the burden of proof in court.  The Ordinance lacks narrow and objective standards for determining whether a customer communication is appropriate for distribution.   The Ordinance, the official law and policy of Montgomery County, therefore deprives Verizon of its rights under the First and Fourteenth Amendments to the United States Constitution.

156.    Ordinance section 8A-14(d) is causing Verizon present and immediate harm, for Verizon cannot obtain the cable franchise that it currently seeks without submitting to this unlawful provision and without waiving its right to challenge this provision's legality.  *See* Ordinance § 8A-6 (requiring franchisees to comply with all applicable County laws); County Franchise Agreement § 2(h)(3) (requiring Verizon to waive, as a condition of obtaining a franchise, any future challenges to the legality of the Ordinance).

157.    Verizon is entitled to a declaration that Ordinance section 8A-14(d) violates the First Amendment on its face and an injunction against its enforcement.

### COUNT THREE
### (Facial Challenge to the Ordinance's Requirement that Cable Operators Pay a 5% Franchise Fee on Gross Revenues Derived from Telecommunications and Broadband Internet Services, under 47 U.S.C. §§ 542, 541(b)(3)(B), 253(a) and 544(b)(1))

158.    Verizon realleges and incorporates herein by reference all previous paragraphs.

159.    Title VI of the Communications Act prohibits local franchising authorities from imposing a franchise fee on non-cable services.  *See* 47 U.S.C. § 542(b), (g)(1).  The Act also prohibits franchise authorities from "impos[ing] any requirement . . . that has the purpose or effect of prohibiting, limiting, restricting, or conditioning the provision of telecommunications

services by a cable operator." *Id.* § 541(b)(3)(B); *see also id.* § 253(a) (preempting state and local governments from imposing any requirement that may "prohibit or have the effect of prohibiting the ability of any entity to provide any . . . telecommunications service"). The Act also prohibits franchising authorities from establishing "requirements . . . for information services." *Id.* § 544(b)(1).

160.     Ordinance section 8A-12, as definitively interpreted by the County, requires cable service providers to pay franchise fees on all of the revenue they earn from cable, telephone, Internet access, and any other telecommunications or information services they choose to sell in the County over their networks. The Ordinance violates and is preempted by federal law because it applies the cable franchise fee to non-cable services, because it imposes a requirement that has the purpose or effect of prohibiting, limiting, restricting, or conditioning the provision of telecommunications services by a cable operator, and because it constitutes a requirement for information services.

161.     Verizon is entitled to a declaration that the Ordinance, including section 8A-12, violates and is preempted by 47 U.S.C. §§ 542, 541(b)(3)(B), 253(a), and 544(b)(1), insofar as it purports to permit imposition of a cable franchise fee on Title II telecommunications services and Title I information services. Verizon is entitled to an injunction against the enforcement of the Ordinance to that extent.

**COUNT FOUR**

**(Facial Challenge to the Ordinance's Regulation of Telecommunications Services, under 47 U.S.C. §§ 541(b)(3)(B), (D) and 253(a))**

162.     Verizon realleges and incorporates herein by reference all previous paragraphs.

163.     Title VI of the Communications Act prohibits franchise authorities from "impos[ing] any requirement . . . that has the purpose or effect of prohibiting, limiting, restricting, or conditioning the provision of telecommunications services by a cable operator," 47 U.S.C. § 541(b)(3)(B), and from "requir[ing] a cable operator to provide any telecommunications service or facilities . . . as a condition of the initial grant of a franchise," *id.* § 541(b)(3)(D).  Likewise, Title II of the Act preempts states and local governments from imposing any requirement that may "prohibit or have the effect of prohibiting the ability of any entity to provide any . . . telecommunications service." *Id.* § 253(a).

164.     The County's Ordinance, including sections 8A-3, 8A-14, 8A-15, 8A-17, 8A-18, and 8A-31A, violates and is preempted by federal law, because it purports to regulate telecommunications services.  The Ordinance is unlawful because it has the purpose or effect of prohibiting, limiting, restricting, or conditioning the provision of telecommunications services, and requires the provision of telecommunications services as a condition of the initial grant of a cable franchise.

165.     Verizon is entitled to a declaration that the Ordinance violates and is preempted by 47 U.S.C. §§ 541(b)(3)(B), (D), and 253 insofar as it purports to regulate telecommunications services, and an injunction against the enforcement of the Ordinance to that extent.

**COUNT FIVE**
**(Facial Challenge to the Ordinance's Provisions Respecting the County's Acquisition of a**
**Mixed-Use Network, under 47 U.S.C. §§ 541(b)(3)(B), (C), and 253(a))**

166.    Verizon realleges and incorporates herein by reference all previous paragraphs.

167.    Title VI of the Communications Act prohibits localities from requiring a cable

operator "to discontinue the provision of telecommunications service" under any circumstances.

47 U.S.C. § 541(b)(3)(C).  It also prohibits localities from "impos[ing] any requirement . . . that

has the purpose or effect of prohibiting, limiting, restricting, or conditioning the provision of

telecommunications services by a cable operator."  *Id.* § 541(b)(3)(B).  Likewise, Title II of the

Act preempts states and local governments from imposing any requirement that may "prohibit or

have the effect of prohibiting the ability of any entity to provide any . . . telecommunications

service."  *Id.* § 253(a).

168.    Ordinance sections 8A-24(f)(2) and 8A-25 violate and are preempted by federal

law because they condition the grant of a cable franchise on the franchise applicant's agreement

to cede ownership of the entirety of its network in the future, a condition that requires cable

providers to discontinue providing telecommunications services and which has the effect of

prohibiting, limiting, restricting, or conditioning cable service providers' continued ability to

provide telecommunications services.

169.    Ordinance sections 8A-24(f)(2) and 8A-25 are causing Verizon present and

immediate harm, for the company cannot obtain the cable franchise that it currently seeks

without submitting to these unlawful provisions and without waiving its right to challenge these

provisions' legality.  *See* Ordinance § 8A-6 (requiring franchisees to comply with all applicable

County laws); County Franchise Agreement § 2(h)(3) (requiring Verizon to waive, as a condition

of obtaining a franchise, any future challenges to the legality of the Ordinance).

170.     Verizon is entitled to a declaration that Ordinance sections 8A-24(f)(2) and 8A-25

violate and are preempted by 47 U.S.C. §§ 541(b)(3)(B), (C), and 253(a), and an injunction

against their enforcement.

## COUNT SIX
### (Facial Challenge to Ordinance Provisions Subjecting Title II Facilities to Construction and Technical Regulation, under 47 U.S.C. §§ 522(7), 541(b)(3)(B), (D) and 253(a))

171.     Verizon realleges and incorporates herein by reference all previous paragraphs.

172.     Title VI of the Communications Act prohibits franchise authorities from

"impos[ing] any requirement . . . that has the purpose or effect of prohibiting, limiting,

restricting, or conditioning the provision of telecommunications services by a cable operator," 47

U.S.C. § 541(b)(3)(B), and from "requir[ing] a cable operator to provide any telecommunications

service or facilities . . . as a condition of the initial grant of a franchise," *id.* § 541(b)(3)(D).

Likewise, Title II of the Act preempts states and local governments from imposing any

requirement that may "prohibit or have the effect of prohibiting the ability of any entity to

provide any . . . telecommunications service." *Id.* § 253(a).  Title VI of the Act also exempts

from the definition of cable system "a facility of a common carrier which is subject, in whole or

in part, to the provisions of subchapter II of this chapter, except that such facility shall be

considered a cable system . . . to the extent such facility is used" for the provision of cable

service.  *Id.* § 522(7).

173.     The Ordinance's provisions, including those in sections 8A-17 and 8A-18, that

require cable operators to subject their Title II facilities to construction and technical regulation

by the County violate and are preempted by federal law because they have the purpose or effect

of prohibiting, limiting, restricting, or conditioning the provision of telecommunications services,

and because they require the provision of telecommunications facilities as a condition of the

initial grant of a franchise.  The County's adoption of a definition of "cable system" that includes

the entirety of any Title II facility that also provides cable service is preempted by the Act's

definition of "cable system."

174.    Verizon is entitled to a declaration that Ordinance sections 8A-17 and 8A-18

violate and are preempted by 47 U.S.C. §§ 522(7), 541(b)(3)(B) & (D), and 253(a), and an

injunction against their enforcement.

## COUNT SEVEN
**(Facial Challenge to Ordinance Section 8A-25's Binding Arbitration Provision)**

175.    Verizon realleges and incorporates herein by reference all previous paragraphs.

176.    Ordinance section 8A-25 violates Article III, section 40 of the Maryland

Constitution by depriving cable providers of the right to a jury determination of just

compensation.

177.    Ordinance section 8A-25 is causing Verizon present and immediate harm, for the

company cannot obtain the cable franchise that it currently seeks without submitting to this

unlawful provision and without waiving its right to challenge this provision's legality.  *See*

Ordinance § 8A-6 (requiring franchisees to comply with all applicable County laws); County

Franchise Agreement § 2(h)(3) (requiring Verizon to waive, as a condition of obtaining a

franchise, any future challenges to the legality of the Ordinance).

178.    Verizon is entitled to a declaration that Ordinance 8A-25 is inconsistent with the

Maryland Constitution, as well as an injunction against its enforcement.

**COUNT EIGHT**
**(Facial Challenge to the Ordinance and Regulations Governing**
**Broadband Internet Access Services, under 47 U.S.C. § 544 and 541(b)(3)(D))**

179.    Verizon realleges and incorporates herein by reference all previous paragraphs.

180.    Title VI of the Communications Act prohibits a local franchising authority from establishing requirements for "information services."  47 U.S.C. § 544(b)(1).  Wireline broadband Internet access service is an "information service."

181.    Wireline broadband Internet access service is provided by means of telecommunications facilities.  Title VI of the Act prohibits a local franchising authority from requiring a cable provider to provide telecommunications facilities as a condition of the grant of a cable franchise.  *Id.* § 541(b)(3)(D).

182.    The County's Ordinance and Cable Modem Regulations violate and are preempted by federal law because they establish requirements for information services and require a cable operator to provide telecommunications facilities as a condition of the grant of a cable franchise.

183.    Verizon is entitled to a declaration that the Ordinance, including sections 8A-3, 8A-14, 8A-15, 8A-17, 8A-18, and 8A-31A, and the Cable Modem Regulations, including section 08A.02.01.04, violate and are preempted by 47 U.S.C. §§ 544(b)(1) and 541(b)(3)(D) insofar as they purport to regulate information services and require the provision of telecommunications facilities.  Verizon is also entitled to an injunction against the enforcement of those provisions to that extent.

**COUNT NINE**
**(Facial Challenge under Maryland Law to the Ordinance and Cable Modem Regulations)**

184.    Verizon realleges and incorporates herein by reference all previous paragraphs.

185.    Maryland law grants the state PSC exclusive jurisdiction to regulate intrastate telecommunications services provided by telephone companies operating within the state.

186.    Maryland law also grants the state PSC exclusive jurisdiction to regulate the facilities used to provide such services, with a limited exception for local prescription of reasonable regulations for the use of public rights-of-way.

187.    Maryland law also preempts counties and municipalities from regulating broadband Internet access services.

188.    The County Ordinance and Cable Modem Regulations, on their face, regulate integrated telecommunications-data-video networks and the telecommunications and Internet services provided by means of those networks.  Specifically, the County Ordinance and Cable Modem Regulations regulate telecommunications services and broadband Internet access service provided by means of telecommunications facilities.  To the extent that those services are not subject to exclusive federal jurisdiction, they are subject to the exclusive jurisdiction of the PSC. Further, because the Ordinance and Cable Modem Regulations go beyond reasonable regulation of the use of rights-of-way, their regulation of cable providers' mixed-use networks is subject to the exclusive jurisdiction of the PSC.  Accordingly, the County Ordinance and Cable Modem Regulations are preempted by Maryland law.

189.    Verizon is entitled to a declaration that the provisions of the Ordinance and the Cable Modem Regulations that regulate telecommunications facilities, telecommunications services, and broadband Internet access service provided by means of telecommunications

facilities violate and are preempted by state law, as well as an injunction against their enforcement.

### COUNT TEN
#### (Montgomery County's Delay in Granting a Franchise Violates Verizon's First Amendment Rights)

190.    Verizon realleges and incorporates herein by reference all previous paragraphs.

191.    The County has violated—and continues to violate—Verizon's First and Fourteenth Amendment rights by delaying approval of Verizon's franchise proposal.  Each day of continued delay by the County deprives Verizon of its constitutional right to speak. Verizon is entitled to a declaration that the County has illegally denied Verizon's right to speak through undue delay.  Verizon is further entitled to an injunction directing the parties to engage in good-faith negotiations over the terms of a franchise agreement, with the objective of reaching agreement within sixty days.  In the event that the parties fail to reach agreement, Verizon is entitled to such additional relief as may be necessary at that time, up to and including an order directing the County to grant Verizon a franchise subject only to the minimum requirements of the federal Cable Act as determined by this Court.

### COUNT ELEVEN
#### (The County's Demands for Fees, In-Kind Contributions, and Regulatory Authority Violate Verizon's First Amendment Rights)

192.    Verizon realleges and incorporates herein by reference all previous paragraphs.

193.    The County has deprived and continues to deprive Verizon of its First and Fourteenth Amendment rights by imposing unduly heavy burdens on Verizon's speech.  The County's requirements that Verizon pay exorbitant fees, contribute in-kind benefits, designate excessive PEG channel capacity, submit to local authority of its telecommunications facilities and telecommunications and information services, and agree to other requirements impose

significant burdens on Verizon's rights to free speech.  These burdens and requirements do not further important or substantial governmental interests, they are not narrowly tailored to any valid governmental interests, and they do not leave open ample alternatives for communication. Because these requirements are invalid under state and federal law, the County's decision to condition the grant of a cable franchise on Verizon's acceptance of these requirements also constitutes an invalid prior restraint.

194.    Verizon is entitled to a declaration stating that the County's requirements violate the First Amendment and an injunction preventing the County from seeking to enforce them.

### COUNT TWELVE
**(The County's Requirement that Verizon Forfeit a $2 Million Bond and Exit the Entire D.C. Market Before Refraining From Speaking Violates the First Amendment)**

195.    Verizon realleges and incorporates herein by reference all previous paragraphs.

196.    The County's requirement that Verizon forfeit a $2 million performance bond and cease providing service everywhere in the Washington, D.C. metropolitan area if it wishes to terminate its cable service in the County unlawfully compels Verizon to speak.  The County's requirement does not further important or substantial governmental interests, and it burdens more speech than is necessary to further any legitimate governmental interests.  The requirement therefore violates Verizon's First and Fourteenth Amendment rights.

197.    Verizon is entitled to a declaration stating that the County's requirement violates the First Amendment and an injunction preventing the County from seeking to enforce it.

**COUNT THIRTEEN**
**(As-applied Challenge to PEG Channel Capacity Requirements,**
**under 47 U.S.C. § 541(a)(4)(B))**

198.     Verizon realleges and incorporates herein by reference all previous paragraphs.

199.     The Cable Act prohibits local franchising authorities from requiring cable service providers to provide channel capacity for PEG programming in excess of what is "adequate" to meet the locality's needs.  47 U.S.C. § 541(a)(4)(B).

200.     The County's requirement that Verizon provide 78 megahertz of PEG channel capacity violates and is preempted by federal law because it constitutes a requirement that Verizon provide more PEG channel capacity than is "adequate" to meet the County's needs.

201.     Verizon is entitled to a declaration stating that the County's requirement that Verizon provide 78 megahertz of channel capacity for PEG programming violates and is preempted by 47 U.S.C. § 541(a)(4)(B) and an injunction precluding the County from conditioning the grant of a cable franchise on Verizon's agreement to provide PEG channel capacity in excess of an amount that is "adequate" to meet the County's needs.

**COUNT FOURTEEN**
**(As-applied Challenge to PEG Programming Funding Requirements,**
**under 47 U.S.C. §§ 531, 541(a)(4)(B), and 542)**

202.     Verizon realleges and incorporates herein by reference all previous paragraphs.

203.     The Cable Act prohibits localities from requiring cable franchise applicants to provide financial support for PEG programming.  47 U.S.C. § 531(a)-(c).

204.     Even if a locality could require cable franchise applicants to provide financial support for PEG programming (which it may not), the Cable Act prohibits localities from imposing any obligations with respect to PEG that exceed what is "adequate" to meet the locality's needs.  *Id.* § 541(a)(4)(B).

- 70 -

205.    Even if a locality could require cable franchise applicants to provide financial support for PEG programming (which it may not), the Cable Act requires that any funds not devoted to the capital costs of PEG access facilities count against the 5% cap on franchise fees. *Id.* § 542(b), (g)(2)(C).

206.    The County's requirement that Verizon pay 3% of its gross revenues each year to support the delivery of PEG programming violates and is preempted by federal law because it imposes financial support requirements.

207.    In the alternative, the County's requirement that Verizon pay 3% of its gross revenues annually to support the delivery of PEG programming, in addition to a 5% franchise fee, violates and is preempted by federal law because it exceeds the amount that would be "adequate" to meet the County's reasonable needs.  Verizon also has no assurance that the funds collected will be used for PEG capital costs, and thus, to the extent those funds are not used for capital purposes, the County's requirement is inconsistent with the Cable Act's 5% cap on franchise fees.

208.    Verizon is entitled to a declaration stating that the County's requirement that Verizon pay 3% of its gross revenues annually to support the delivery of PEG programming violates and is preempted by 47 U.S.C. § 531, and/or, in the alternative, 47 U.S.C. § 541(a)(4)(B) and 47 U.S.C. § 542.  Verizon is entitled to an injunction precluding the County from seeking to apply the requirement.

## COUNT FIFTEEN
### (As-applied Challenge to I-Net Funding Requirements, under 47 U.S.C. §§ 531 and 542)

209.    Verizon realleges and incorporates herein by reference all previous paragraphs.

210.    The Cable Act prohibits localities from requiring cable franchise applicants to provide financial support for I-Net purposes.  47 U.S.C. § 531(a)-(c).

211.    Even if a locality could require I-Net support other than channel capacity (which it may not), any support payments must count against the 5% cap on franchise fees.

212.    The County's requirement that Verizon pay 3% of its gross revenues annually for I-Net purposes violates and is preempted by federal law because it imposes financial support requirements for I-Net activities and because it does not count that assessment against the 5% franchise fee limitation.

213.    Verizon is entitled to a declaration stating that the County's requirement that Verizon pay 3% of its gross revenues annually to I-Net activities violates and is preempted by 47 U.S.C. § 531, and/or, in the alternative, 47 U.S.C. § 542.  Verizon is entitled to an injunction precluding the County from seeking to apply the requirement.

## COUNT SIXTEEN
### (As-applied Challenge to Requirement that Verizon Pay a "Franchise Acceptance Fee," under 47 U.S.C. § 542)

214.    Verizon realleges and incorporates herein by reference all previous paragraphs.

215.    The Cable Act caps total assessments at 5% of gross cable revenues.  47 U.S.C. § 542(b).  It exempts from this cap requirements "incidental to the awarding or enforcing of the franchise, including payments for bonds, security funds, letters of credit, insurance, indemnification, penalties, or liquidated damages."  *Id.* § 542(g)(2)(D).

216.    The County's requirement that Verizon pay all of the County's costs of negotiating and approving a franchise agreement—including the attorneys' fees incurred by County officials, the costs of separate outside counsel for the County Council and each participating municipality, engineering consulting costs, and financial consulting expenses— violates and is preempted by 47 U.S.C. § 542 because these costs exceed the 5% cap on franchise fees and are not "incidental" charges within the meaning of section 542(g)(2)(D).

217.    Verizon is entitled to a declaration stating that the "franchise acceptance fee" the County has assessed violates and is preempted by 47 U.S.C. § 542 and an injunction precluding the County from imposing such a fee.

## COUNT SEVENTEEN
### (As-applied Challenge to Requirement that Verizon Provide Free Cable Service, under 47 U.S.C. §§ 542, 543, and 544)

218.    Verizon realleges and incorporates herein by reference all previous paragraphs.

219.    The Cable Act caps total assessments at 5% of gross cable revenues.  47 U.S.C. § 542(b).

220.    The Cable Act also provides that localities lack authority under the Cable Act to require franchise applicants to provide cable service.  *Id.* § 544.

221.    The Cable Act also prohibits localities from regulating cable rates absent permission from the FCC.  *Id.* § 543(a)(3) & (4).

222.    The County's requirement that Verizon agree to provide free cable facilities and service to public and non-profit entities violates and is preempted by federal law because it is an assessment in excess of the 5% cap established by 47 U.S.C. § 542.  The County's requirement does not fall within any of the limited exceptions to the 5% franchise fee ceiling.  *Id.* § 542(g)(2).

223.    The County's requirement that Verizon provide free cable service violates and is preempted by 47 U.S.C. § 544 because it establishes a requirement for cable service.

224.    The County's requirement that Verizon provide free cable service constitutes unlawful rate regulation under 47 U.S.C. § 543, because it prescribes a rate of zero for the cable services Verizon is obligated to provide.  Montgomery County has neither sought nor received permission from the FCC to regulate rates.

225.    Verizon is entitled to a declaration stating that the County's requirement that Verizon provide free cable service and facilities to public and non-profit entities violates and is preempted by 47 U.S.C. §§ 542, 543, 544, and an injunction precluding the County from seeking to apply the requirement to Verizon.

## COUNT EIGHTEEN
### (As-applied Challenge to Requirement that Verizon Provide 100 Wireless "Hot Spots" or Pay the Cash Equivalent, under 47 U.S.C. §§ 541(b)(3)(D), 542, and 544)

226.    Verizon realleges and incorporates herein by reference all previous paragraphs.

227.    The Cable Act caps total assessments at 5% of gross cable revenues.  47 U.S.C. § 542(b).

228.    The Cable Act also prohibits localities from imposing any requirements that do not relate to the establishment or operation of a cable system.  *Id.* § 544.

229.    The Cable Act also prohibits localities from requiring a cable provider to provide information services.  *Id.* § 544(b)(1).

230.    The Cable Act also prohibits localities from requiring a cable provider to provide telecommunications facilities as a condition of obtaining a cable franchise.  *Id.* § 541(b)(3)(D).

231.    The County's requirement that Verizon provide 100 wireless "hot spots" or the cash equivalent violates and is preempted by 47 U.S.C. § 542 because it is an assessment in

excess of the 5% cap on franchise fees. The requirement does not fall within any of the limited exceptions to the 5% franchise fee ceiling. *See id.* § 542(g)(2).

232. The County's requirement that Verizon provide 100 wireless "hot spots" or the cash equivalent violates and is preempted by 47 U.S.C. § 544 because it imposes a requirement that does not relate to the establishment or operation of a cable system.

233. The County's requirement that Verizon provide 100 wireless "hot spots" violates and is preempted by 47 U.S.C. § 544 because it is a requirement for the provision of information services.

234. The County's requirement that Verizon provide 100 wireless "hot spots" violates and is preempted by 47 U.S.C. § 541(b)(3)(D) because it is a requirement for the provision of telecommunications facilities.

235. Verizon is entitled to a declaration stating that the County's requirement that Verizon provide wireless "hot spots" or the cash equivalent violates and is preempted by 47 U.S.C. §§ 541, 542, and 544, and an injunction precluding the County from seeking to apply the requirement to Verizon.

## COUNT NINETEEN
### (As-applied Challenge to Requirement that Verizon Pay a 5% Franchise Fee on Gross Revenues Derived from Broadband Internet Services, under 47 U.S.C. § 542)

236. Verizon realleges and incorporates herein by reference all previous paragraphs.

237. The Cable Act prohibits local franchising authorities from imposing a franchise fee on non-cable services. 47 U.S.C. § 542(b), (g)(1).

238. The County's requirement that Verizon agree to the imposition of franchise fees on broadband Internet access services violates and is preempted by federal law.

239.    Verizon is entitled to a declaration stating that the County's requirement that Verizon agree to the imposition of franchise fees on broadband Internet access services violates and is preempted by 47 U.S.C. § 542, and an injunction precluding the County from seeking to impose the requirement.

### COUNT TWENTY
### (As-applied Challenge to Requirement that Verizon Waive
### Its Statutory Rights to Challenge Adverse Decisions)

240.    Verizon realleges and incorporates herein by reference all previous paragraphs.

241.    The Cable Act prohibits localities from insisting on excessive demands, regulating telecommunications facilities and telecommunications and information services, and unreasonably refusing to grant competitive franchises. *E.g.*, 47 U.S.C. §§ 531, 541, 542. It also provides a statutory mechanism for cable operators to challenge adverse actions by local franchising authorities. *Id.* § 555(a). In addition, 28 U.S.C. § 1331 and 42 U.S.C. § 1983 entitle parties aggrieved by actions by local franchising authorities that violate the Constitution and the Communications Act to obtain judicial review. Attempts to require waiver of operators' rights to judicial review and to circumvent the substantive requirements of the Cable Act violate federal law.

242.    The County's requirement that Verizon waive its rights to challenge the County's Ordinance and unlawful actions by the County violates and is preempted by federal law.

243.    Verizon is entitled to a declaration stating that the County's requirement that Verizon waive its rights to challenge unlawful actions by the County violates and is preempted by 47 U.S.C. §§ 531, 541, 542, 544, 555; 28 U.S.C. § 1331; and 42 U.S.C. § 1983. Verizon is entitled to an injunction precluding the County from requiring Verizon to waive its rights to challenge unlawful actions by the County as a condition of a grant of a cable franchise.

**COUNT TWENTY-ONE**

**(As-applied Challenge to Requirement that Verizon Submit its Title II Facilities to Regulation, under 47 U.S.C. §§ 522(7), 541(b)(3)(B), (D), and 253(a))**

244.     Verizon realleges and incorporates herein by reference all previous paragraphs.

245.     Title VI of the Communications Act prohibits franchise authorities from "impos[ing] any requirement . . . that has the purpose or effect of prohibiting, limiting, restricting, or conditioning the provision of telecommunications services by a cable operator," *id.* § 541(b)(3)(B), and from "requir[ing] a cable operator to provide any telecommunications service or facilities . . . as a condition of the initial grant of a franchise," *id.* § 541(b)(3)(D). Likewise, Title II of the Act preempts states and local governments from imposing any requirement that may "prohibit or have the effect of prohibiting the ability of any entity to provide any . . . telecommunications service." *Id.* § 253(a).  The Act also defines "cable system" to include only those portions of a mixed-use network that are solely dedicated to the provision of cable services.  *Id.* § 522(7).

246.     The County's requirement that Verizon agree to subject its Title II facilities to regulation by the County violates and is preempted by federal law because it has the purpose or effect of prohibiting, limiting, restricting, or conditioning the provision of telecommunications services, because it requires the provision of telecommunications facilities as a condition of the initial grant of a franchise, and because it conflicts with the Cable Act's definition of "cable system."

247.     Verizon is entitled to a declaration stating that the County's requirement that Verizon agree to subject its Title II facilities to regulation by the County violates and is preempted by 47 U.S.C. §§ 522(7), 541(b)(3)(B) and (D), and 253(a), and an injunction precluding the County from seeking to apply that requirement.

**COUNT TWENTY-TWO**
**(As-Applied Challenge under Maryland Law to Requirement that Verizon Submit its**
**Telecommunications Facilities to Regulation)**

248.     Verizon realleges and incorporates herein by reference all previous paragraphs.

249.     Maryland law grants the state PSC exclusive jurisdiction to regulate the facilities used to provide telecommunications services, with a limited exception for local regulation of public rights-of-way.

250.     The County's requirement that Verizon agree to subject its telecommunications facilities to regulation by the County violates and is preempted by state law because such regulation goes beyond the County's limited authority over its rights-of-way.

251.     Verizon is entitled to a declaration stating that the County's requirement that Verizon agree to subject its telecommunications facilities to regulation by the County violates and is preempted by state law, as well as an injunction precluding the County from seeking to apply that requirement.

**COUNT TWENTY-THREE**
**(As-applied Challenge to the County's Refusal to Award a Franchise,**
**under 47 U.S.C. § 541(a)(1))**

252.     Verizon realleges and incorporates herein by reference all previous paragraphs.

253.     The Cable Act provides that "a franchising authority may not grant an exclusive franchise and may not unreasonably refuse to award an additional competitive franchise." 47 U.S.C. § 541(a)(1).

254.     The County's actions violate and are preempted by federal law because the conditions that it has imposed on Verizon constitute an unreasonable refusal to award an additional competitive franchise.

255.     Verizon is entitled to a declaration stating that the County's refusal to award a cable franchise to Verizon violates and is preempted by 47 U.S.C. § 541(a)(1) and an injunction precluding the County from continuing to refuse to award a franchise to Verizon.

## COUNT TWENTY-FOUR
### (Challenge to the County's Contract in Restraint of Trade, under 15 U.S.C. § 1)

256.     Verizon realleges and incorporates herein by reference all previous paragraphs.

257.     The Sherman Act prohibits certain "contract[s], combination[s] in the form of trust or otherwise, or conspirac[ies], in restraint of trade or commerce."  15 U.S.C. § 1.

258.     Comcast and the County have combined to create an agreement that is embodied in Comcast's franchise agreement, including its "most favored nations" provision.

259.     As interpreted and enforced by the County, the agreement sets an exorbitant minimum payment for obtaining a franchise to provide cable service to County residents.

260.     The "most favored nations" provision has the purpose and effect of unreasonably restraining competition and imposing unreasonable barriers to entry in the relevant market.

261.     The "most favored nations" provision has a substantial impact on interstate commerce in cable television programming, advertising, and other non-video communications services.

262.     As a consequence of the County's interpretation and enforcement of the "most favored nations" provision in its agreement with Comcast, Comcast is able to charge supracompetitive prices for cable service, harming consumers.

263.     As a consequence of the County's interpretation and enforcement of the "most favored nations" provision in its agreement with Comcast, Verizon has been prevented from

providing cable service in the County.  As a result, Verizon has been deprived of substantial revenues and has lost consumer goodwill.  Verizon has thus suffered antitrust injury.

264.    Verizon is entitled to a declaration that the agreement between the County and Comcast is an unlawful restraint of trade under 15 U.S.C. § 1, and an injunction against the enforcement of that agreement to that extent.

## COUNT TWENTY-FIVE
### (Challenge to the Conspiracy to Monopolize, under 15 U.S.C. § 2)

265.    Verizon realleges and incorporates herein by reference all previous paragraphs.

266.    The Sherman Act prohibits "combin[ations] or conspir[acies] with any other person or persons, to monopolize" commerce.  15 U.S.C. § 2.

267.    Comcast exercises monopoly power in the relevant market.

268.    The County and Comcast have conspired and agreed to preserve Comcast's monopoly in the relevant market.

269.    The County and Comcast's conspiratorial agreement has a substantial impact on interstate commerce in the distribution of cable television programming, advertising, and other non-video communications services.

270.    As a consequence of the conspiracy, Comcast is able to charge supracompetitive prices for cable service, harming consumers.

271.    As a consequence of the conspiracy, Verizon has been prevented from providing cable service in the County.  As a result, Verizon has been deprived of substantial revenues and has lost consumer goodwill.  Verizon has thus suffered antitrust injury.

272. Verizon is entitled to a declaration that the agreement between the County and Comcast is an unlawful conspiracy to monopolize under 15 U.S.C. § 2, and an injunction against the enforcement of that agreement to that extent.

## PRAYER FOR RELIEF

Wherefore, Verizon prays for the following relief:

A. A declaration that the Ordinance's franchise application, review, and acceptance scheme violates the First Amendment and is therefore void and unenforceable;

B. A declaration that the Ordinance's provision requiring advance approval of customer-service communications violates the First Amendment and is therefore void and unenforceable;

C. A declaration that the Ordinance's provisions authorizing imposition of a 5% franchise fee on gross revenues derived from non-cable services are invalid and preempted by the federal Communications Act;

D. A declaration that the Ordinance's provisions purporting to regulate telecommunications services are invalid and preempted by the federal Communications Act;

E. A declaration that the Ordinance's provisions purporting to allow the County to acquire a mixed-use network are invalid and preempted by the federal Communications Act;

F. A declaration that the Ordinance's provisions purporting to subject telecommunications facilities to construction and technical regulation are invalid and preempted by the federal Communications Act;

G. A declaration that the Ordinance's binding arbitration provision covering disputes over just compensation for seized property violates and is preempted by the Maryland Constitution;

H.      A declaration that the Ordinance's provisions purporting to regulate information services are invalid and preempted by the federal Communications Act;

I.      A declaration that the County's Cable Modem Regulations are invalid and preempted by the federal Communications Act;

J.      A declaration that the provisions of the County's Ordinance and Cable Modem Regulations that regulate telecommunications facilities, telecommunications services, and broadband Internet access service provided by means of telecommunications facilities are invalid and preempted under Maryland law;

K.      A declaration that the County, through undue delay in issuing a cable franchise, has illegally blocked Verizon's ability to speak in violation of the First Amendment;

L.      A declaration that the County's requirements that Verizon pay exorbitant fees, contribute in-kind benefits, designate excessive PEG channels, submit to local authority of its mixed-use network and non-cable services, and agree to other requirements violate the First Amendment;

M.      A declaration that the County's requirement that Verizon forfeit a $2 million bond and cease providing cable service throughout the Washington, D.C. area if Verizon wishes to stop providing cable service in the County violates the First Amendment;

N.      A declaration that the County's requirement that Verizon provide 78 megahertz of channel capacity for PEG programming violates and is preempted by the federal Cable Act;

O.      A declaration that the County's requirement that Verizon fund PEG activities through a fee levied on gross revenues violates and is preempted by the federal Cable Act;

P.      A declaration that the County's requirement that Verizon fund I-Net activities through a fee levied on gross revenues violates and is preempted by the federal Cable Act;

Q.      A declaration that the County's requirement that Verizon pay a 5% franchise fee on gross revenues derived from broadband Internet services violates and is preempted by the federal Communications Act;

R.      A declaration that the County's requirement that Verizon pay for all of the County's and participating municipalities' costs, without limitation, in the form of a "franchise acceptance fee" violates and is preempted by the federal Cable Act;

S.      A declaration that the County's requirement that Verizon provide free cable service and facilities to public and non-profit entities violates and is preempted by the federal Cable Act;

T.      A declaration that the County's requirement that Verizon provide 100 wireless "hot spots" free of charge or their cash equivalent violates and is preempted by the federal Cable Act;

U.      A declaration that the County's requirement that Verizon waive its statutory rights to challenge the County's cable laws and the County's unlawful decisions violates and is preempted by federal law;

V.      A declaration that the County's requirement that Verizon submit its Title II facilities to local regulation violates and is preempted by the federal Communications Act;

W.      A declaration that the County's requirement that Verizon submit its telecommunications facilities to local regulation violates and is preempted by state law;

X.      A declaration that the County has imposed conditions upon Verizon that constitute an unreasonable refusal to award an additional competitive franchise and that the County's refusal to award that franchise violates and is preempted by the federal Cable Act;

Y.     A declaration that the County's agreement with Comcast unreasonably restrains competition and constitutes a conspiracy to maintain Comcast's monopoly in violation of 15 U.S.C. §§ 1 and 2;

Z.     A preliminary and permanent injunction directing the parties to engage in good-faith negotiations over the terms of a franchise agreement, with the objective of reaching agreement within sixty days, and further providing that if the parties fail to reach agreement, Verizon is entitled to such additional relief as may be necessary at that time, up to and including an order directing the County to grant Verizon a franchise subject only to the minimum requirements of the federal Cable Act as determined by this Court.

AA.    Costs and reasonable attorneys' fees as permitted by law; and

BB.    Such other and further relief as the Court may find necessary and appropriate.

Respectfully submitted,

DATED:  June 29, 2006          MILES & STOCKBRIDGE P.C.
                               JAMES P. GARLAND (#00182)
                               E-mail: jgarland@milesstockbridge.com
                               SCOTT R. HAIBER (#25947)
                               E-mail: shaiber@milesstockbridge.com
                               KIRSTEN M. ERIKSSON (#26884)
                               E-mail: keriksson@milesstockbridge.com
                               10 Light Street
                               Baltimore, MD  21202-1487
                               Telephone: (410) 385-3755
                               Facsimile: (410) 385-3700


                               By:_____/s/_____
                                      JAMES P. GARLAND

VERIZON SERVICES GROUP INC.
  JOHN P. FRANTZ
  E-mail: john.frantz@verizon.com
  One Verizon Way
  VC 54N067
  Basking Ridge, NJ  07929
  Telephone: (908) 559-5731
  Facsimile: (908) 204-3258

  JOHN THORNE
  E-mail: john.thorne@verizon.com
  1515 North Courthouse Road
  Suite 500
  Arlington, VA  22201
  Telephone: (703) 351-3900
  Facsimile: (703) 351-3670

MUNGER, TOLLES & OLSON LLP
  HENRY WEISSMANN
  E-mail: Henry.Weissmann@mto.com
  AIMEE FEINBERG
  E-mail: Aimee.Feinberg@mto.com
  355 South Grand Avenue
  Thirty-Fifth Floor
  Los Angeles, CA  90071-1560
  Telephone: (213) 683-9100
  Facsimile: (213) 687-3702


Attorneys for Plaintiff Verizon Maryland Inc.